561 A.2d 227

Sandra S. CARRIER

v.

CRESTAR BANK, N.A., et al.

No. 122, Sept. Term, 1988.

Court of Appeals of Maryland.

July 28, 1989.

702

John L. Wood (Niles, Barton & Wilmer, Baltimore, Neil S. Kurlander, Blumenthal, Wayson, Downs & Offutt, P.A. Annapolis), all on brief for appellant.

Nicholas D. Ward (Noterman & Ward, Washington, D.C.), William L. Farrar, Jr. (H. George Schweitzer, Alagia, Day, Marshall, Mintmire & Chauvin, Washington, D.C.), Nancy K. Glassman, Washington, D.C., William A. Franch, Franch & Jarashow, P.A., Annapolis, all on brief, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

Maryland Code (1974, 1988 Cum.Supp.) § 7–501(a) of the Estates and Trusts Article provides that unless waived by the orphans' court for good cause shown, the personal representative for an estate "shall give written notice to all interested persons of the filing of an account with the court." Section 7–501(b) provides that "[e]xceptions to an

account must be filed with the register [of wills] within 20 days of the approval of the account by the court."[1] Similarly, § 9–104(e) provides that "[a]fter the probable charges against the estate are known, the personal representative may mail or deliver a proposal for distribution to all persons who have a right to object to the proposed distribution" and that "the right of a distributee to object to the proposed distribution terminates if he fails to object in writing received by the personal representative within 30 days after mailing or delivery of the proposal." In this case, we consider whether under these statutes an individual who is both a beneficiary of a testamentary trust per autre vie (during the life of another person) and a remainderman of the corpus of that trust has standing to object to the account and the proposed schedule of distribution filed by the personal representatives.

## I.

Victor O. Schinnerer, a resident of Anne Arundel County, died on October 18, 1985. He was survived by his widow, Muriel J. Schinnerer, his children, William R. Schinnerer, Sally S. Fant, and the appellant, Sandra S. Carrier, and by his grandchildren, Jeffrey R. Schinnerer, Kimberly A. Schinnerer, Thomas D. Fant, Jr., Terrence V. Fant, and John J. Younger, Jr. Prior to his death, Victor executed a Last Will and Testament, dated October 8, 1982, a first codicil dated April 5, 1984, a second codicil dated August 17, 1984, and a third codicil dated March 8, 1985.

In his will, Victor provided for the division of his property between his wife, his three children, and his five grandchildren. He bequeathed all of his personal property, including household goods, automobiles and watercraft to his wife, Muriel. In the succeeding paragraphs, Victor provided for the disposition of the remainder of his estate. In Item 3, he discharged all first or second mortgages, deed of trust

---

1. Unless otherwise indicated, all section references are to the Estates and Trusts Article of the Code.

notes, and promissory notes, which were secured by mortgages or deeds of trust, owed to him by any of his children, noting that at the time of the will's execution, he had made such loans to William and Sally. Victor also directed the Personal Representatives to forgive any future loans made to his children which were secured by mortgages. In addition, he discharged the indebtedness of William and his wife, Marguerite, under an unsecured demand note in the original amount of $75,000 dated August 17, 1982.

Item 4 of the Will established a "Marital Trust" for the benefit of Muriel Schinnerer. Victor directed the Personal Representatives to fund the trust by setting aside out of Victor's estate "property equal in value to the maximum marital deduction allowable in the determination of the Federal estate tax upon my estate." The Will directed the Trustees for the Marital Trust to pay the net income from the trust to Muriel quarterly during her life and to pay her part or all of the principal, upon receiving a written request from her. Muriel also received a testamentary power of appointment over the residue of the income and principal, and the Will provided that if Muriel should fail to exercise this power then the residue of the Marital Trust should be paid to the Residuary Trust created in the succeeding paragraphs.

In Item 5 of the Will, Victor provided that the remainder of his property be distributed to a trust fund, designated as the "Residuary Trust." He directed the Trustees to pay the net income from this trust quarterly to his three children in varying percentages. Specifically, Sally Fant would receive thirty percent of the net income, Sandra Carrier would receive twenty percent of the net income, and William Schinnerer would receive fifty percent of the net income. Item 5 also provided that upon Muriel's death, "the Trustees shall allocate and distribute the Residuary Trust as then constituted in the manner as hereinafter set forth:"

A. DISTRIBUTION OF SIXTY PERCENT (60%)

My Trustees shall allocate sixty percent (60%) of the principal and undistributed income of the Residuary Trust

and I direct that they pay over such part or portion as follows:

(a) Forty-five percent (45%) thereof unto my son, WILLIAM REID SCHINNERER, if he survives me, free of trust....

(b) Thirty–Five percent (35%) thereof unto my daughter, SALLY SCHINNERER FANT, if she survives me, free of trust....

(c) The remaining twenty percent (20%) thereof unto my daughter, SANDRA SCHINNERER CARRIER, if she survives me, free of trust....

The second part of Item 5, entitled "B. Distribution to Subtrusts," directed the Personal Representatives to divide the remaining forty percent of the corpus among three subtrusts. Forty-five percent of the forty percent of the corpus was to be held in trust for the benefit of Jeffrey and Kimberly Schinnerer, until the death of William Schinnerer, or when either of these two grandchildren reached their thirtieth birthday, at which time the corpus was to be distributed to them. Forty percent of the original forty percent of the corpus was distributed to a similar subtrust for the benefit of Thomas Fant, Jr. and Terrence Fant, and fifteen percent of the original forty percent was distributed to a subtrust for the benefit of John Younger, Jr.

Item 8 of the Will sets forth the powers of the Trustees, authorizing them "to retain, invest, reinvest and exchange the funds in the Trust Estates in such manner and in such ... property of any nature, whether real or personal, as the Trustees may from time to time see fit in the exercise of their best judgment." And that "[f]or the purpose of dividing said Trust into separate subtrusts or dividing any subtrust into parts or shares, my Trustees shall not be required to convert any property into money but may allow or allot to any part or share or subtrust any property of the trust or undivided interest therein and the judgment and decisions of my Trustees shall be conclusive and binding upon the beneficiaries of said trust, subtrust, part or share."

Finally, in Item 12 of the Will, the decedent designated Muriel Schinnerer and National Savings and Trust Company of Washington, D.C., now known as Crestar Bank, N.A., as Personal Representatives of the estate and as Trustees under the Will. This section also gave the Personal Representatives "full power and discretion in the management and control" of the estate.

In April 1984, Victor executed a first codicil to his Will, adding an additional paragraph to Item 8 of the Will. It provided:

I have guaranteed certain loans of my son, William Reid Schinnerer, and his wife, Marguerite R. Schinnerer, from NS & T Bank, N.A. and in connection therewith I have executed a Hypothecation Agreement to that lender covering United States Government Bonds and other securities having a value in excess of $600,000.00. Notwithstanding anything to the contrary contained elsewhere in this Last Will and Testament I hereby direct that my Personal Representatives deduct and reduce from any gift, devise or bequest to my son or in trust for his benefit or the benefit of his children, the total amount of all claims, charges, judgments or demands hereafter called upon me or my estate to pay resulting from my aforesaid guarantee or pledge of assets. If those United States Government Bonds and other securities or any substituted properties are not returned to me prior to my death free of such pledge or Hypothecation Agreement, then my Personal Representatives shall reduce those gifts, devises, bequests or other benefits described above by the amount of such assets not returned.

All decisions and computations of any deductions made by my Personal Representatives and their decisions in connection therewith shall be conclusive and binding upon all beneficiaries under this Will.

Victor subsequently executed two other codicils. The second codicil dated August 17, 1984 added an additional paragraph at the end of Item 2 of the Will. In this paragraph, Victor devised a townhouse on Brandywine

Street in Philadelphia, Pennsylvania, to his daughter, Sally Fant, and ordered the Personal Representatives to satisfy and fully discharge all mortgages or similar encumbrances which might be attached to the property at his death. In the third codicil dated March 8, 1985, Victor ordered that that part of his will devising the townhouse in Philadelphia to Sally be deleted from Item 2. Instead, Victor devised a condominium in Ocean City, New Jersey to Sally with the same provision for the satisfaction of any mortgages remaining on the property at the time of his death.

At the time of Victor's death on October 18, 1985, William and Marguerite Schinnerer had not repaid the loans owed NS & T Bank which were guaranteed by the Hypothecation Agreement, nor had they returned the pledged collateral to Victor free of this encumbrance.

Following Victor's death, the Personal Representatives petitioned for probate of Victor's Will and the three codicils. Accompanying the petition was a "List of All Interested Persons," which included Muriel J. Schinnerer, William Reid Schinnerer, Sally Schinnerer Fant, Sandra Schinnerer Carrier, and NS & T Bank, N.A. as interested parties. The will and the three codicils were admitted to probate in the Orphans' Court for Anne Arundel County on October 29, 1985.

The Personal Representatives filed the initial Inventory for the Estate on February 26, 1986, reporting $1,210,435.19 in assets; among the listed assets were the government bonds which Victor had pledged as security against William and Marguerite's loan. In the inventory, the Personal Representatives noted that the bonds were "held in NS & T Bank Investment Management Account 35081721: pledged as collateral." The inventory also listed two notes of William and Marguerite payable to Victor in the amounts of $37,500.00 and $75,000.00. The first figure of $37,500 represented the balance remaining on the original loan of $75,000 made by Victor to William and Marguerite under the unsecured demand note dated August 17, 1982, and mentioned in Item 3 of Victor's will. The second figure of

$75,000 represented the balance remaining under an unsecured demand note originally in the amount of $100,000, which according to the inventory, was issued to "NS & T Bank and William R. Schinnerer, Trustees, Under Agreement dated June 20, 1983, makers." This unsecured demand note appears to have been issued subsequent to the execution of the Will and thus is not mentioned therein. The inventory entry on the first note bore the notation "discharged per terms of Will." The inventory entry on the second note did not bear this notation. The inventory also listed a Deed of Trust dated July 26, 1978 in the amount of $85,000.00 due to be paid by William and Marguerite Schinnerer by July 26, 2008. This item also bore the notation "discharged per terms of Will." The Personal Representatives sent a copy of the inventory to Sandra Carrier on February 28, 1986.

In May 1986, William and Marguerite Schinnerer repaid the loans owed to NS & T Bank, and the collateral securing these loans was released from the pledge.

On December 4, 1986, the Personal Representatives filed the First Administration Account for the estate; they filed the Proposed Schedule of Distribution on July 9, 1987. Upon filing each of these documents, the Personal Representatives sent notice to Carrier, indicating that the account and the schedule of distribution had been filed and informing her that she could file objections to either one.

Carrier subsequently filed Exceptions to the First Administration Account, Exceptions to the Inventory and Proposed Schedule of Distribution, and a Request for Hearing on her Exceptions. In her Exceptions to the First Administration Account, Carrier objected to several items contained in the inventory and administration account, including the Personal Representatives' reduction of the value of the second unsecured demand note from the original value of $100,000 to $75,000 and their reduction of the total value of Victor's stocks and bonds. She maintained that these reductions would result in an incorrect valuation of Victor's estate which would cause "a distribution not in keeping

with the terms of the decedent's Last Will and Testament as amended by the aforesaid Codicils." Carrier's Exceptions to the Inventory and Proposed Schedule of Distribution disputed the Personal Representatives' allocation of the income earned during the administration period and the appreciation of estate assets to the Residuary Trust. She averred that the Personal Representatives should distribute the unsecured demand note to the Residuary Trust and not the Marital Trust, that they had failed to adequately document the administration expenses, and that they should distribute a specific asset (the so-called Safeway lease) to the Residuary Trust and not the Marital Trust.

On June 30, 1988, Carrier filed Additional Exceptions to the Proposed Schedule of Distribution. They focused upon the provisions in the first codicil which directed the Personal Representatives to reduce the bequests made to William Schinnerer, or in trust for his children, if Victor's securities were not returned to him prior to his death free of the pledge under the Hypothecation Agreement with the bank. Carrier noted that at the time of Victor's death, the securities were still held as collateral under the Hypothecation Agreement. Thus, Carrier contended that under the terms of the first codicil, the gifts to William and his children should be reduced by the value of the collateralized securities. Carrier complained that the Personal Representatives, contrary to Item 8 of Victor's will did not reduce the gifts. In urging that the orphans' court direct the Personal Representatives to so reduce the bequests to William and his children, Carrier asserted that "[i]f the amount of such collateralized assets at the time of Mr. Schinnerer's death exceeded the interests of William Reid Schinnerer or his children in the Residuary Trust ... the cancellation of [William's] indebtedness ... under Item 3 ... shall be nullified to the extent of such excess and the Personal Representatives shall be instructed to collect upon such indebtedness for the benefit of the Estate."

Initially, the Personal Representatives filed responses to Carrier's exceptions, disputing her claims. On July 12,

1988, however, the Personal Representatives filed a Motion to Strike Carrier's pleadings, claiming that under § 1–101(g) and (k), she lacked standing to object to the administration account and proposed schedule of distribution. Specifically, they argued that Carrier was not a "legatee" or an "interested person," as those terms are defined in § 1–101, because she was simply a beneficiary of a testamentary trust. They contended that under § 7–501(a) only "interested persons" could file objections to an account and that because Carrier was not an interested person her exceptions should be stricken.

On July 21, 1988, after hearing arguments from the parties, the orphans' court issued an order, finding that Carrier was not a "legatee" under Victor's will, as that term is defined in § 1–101(k). The court concluded that Carrier was neither an "interested person" under § 1–101(g) entitled to file exceptions to the Final Account, nor a "distributee" who may object to the proposed distribution under 9–104(e). Consequently, the court ordered that Carrier's exceptions be stricken.[2] Carrier appealed to the Court of Special Appeals. *See* Maryland Code (1974, 1984 Repl.Vol.) § 12–501 of the Courts and Judicial Proceedings Article. We granted certiorari prior to decision by the intermediate court to consider the significant issues raised in the case.

## II.

Carrier argues that the orphans' court's dismissal of her objections to the first accounting and to the distribution schedule violated her rights under the Fourteenth Amendment by depriving her of property without due process of law. We first must decide whether the orphans' court correctly interpreted § 7–501 and § 9–104 as prohibiting Carrier from maintaining her objections. Because the pro-

---

**2.** In its order, the court granted Carrier's motion for a stay of distribution pending appeal with respect to the Safeway lease and those assets which are the subject of the First Codicil and Item 3 of the Will.

visions of § 7–501 for filing exceptions to an account differ from the provisions of § 9–104 for objecting to a final distribution, we will consider each of these statutes seriatim.

## A.

Section 7–501 provides:

(a) *Filing an account.*—Unless waived by the court for good cause shown, the personal representative shall give written notice to all interested persons of the filing of an account with the court.

(b) *Exceptions.*—Exceptions to an account must be filed with the register within 20 days of the approval of the account by the court. Exceptions may not be filed concerning an item which has become final and binding under § 7–502. Copies of exceptions shall be mailed by the exceptant to the personal representative.

The orphans' court construed § 7–501 to mean that only an "interested person," as defined in § 1–101(g), may file an exception to an account. Section 1–101(g) defines an "interested person" as "[a] legatee in being, not fully paid, whether his interest is vested or contingent." Section 1–101(k) of the statute further defines a "legatee" as "a person who under the terms of a will would receive a legacy," [3] including "a trustee but not a beneficiary of an interest under the trust."

Because Victor's will designated Carrier as a beneficiary of the residuary trust, the orphans' court found that she was not an interested person as defined by § 1–101(g). Because under its interpretation of § 7–501 only interested persons could file an objection to an account, the court concluded that Carrier did not have standing to object to the Personal Representatives' administration account. The or-

---

**3.** Section 1–101(j) defines a "legacy" as "any property disposed of by will, including property disposed of in a residuary clause and assets passing by the exercise by the decedent of a testamentary power of appointment."

phans' court committed two errors in making this determination. First, it erred in finding that Carrier was not an interested person, and secondly, it erred in interpreting § 7–501 as providing that only interested persons could file exceptions to an account.

■ As previously noted, § 1–101 does not include a beneficiary of a trust within the definition of interested person. The Explanatory Comment which follows this section, however, states that although the "[b]eneficiaries of a trust are not 'interested persons' because under subsection [ (k) ], 'legatee' means only the trustees, and not the beneficiaries of the trust. . . . [nevertheless] [i]n the rare instances where there is a legal future interest, the owners of the future interest will be 'interested persons.' " [4]

In Item 5 of his Will, Victor directed that the property remaining after the devise to the Marital Trust be placed in a Residuary Trust for the benefit of his son, William, and his daughters, Sally and Sandra. The Will provided that the Residuary Trust was to last until the death of Victor's wife, Muriel, and upon her death the Trustees were to distribute sixty percent of the corpus in various shares to Victor's three children, and place the remaining forty percent into a subtrust for their children's benefit. These provisions resulted in Carrier receiving two distinct interests in her father's estate, rather than one. First, she received a beneficial interest under the Residuary Trust. Because the Residuary Trust was limited in its duration to Muriel's life, Carrier's beneficial interest was an interest per autre vie, (i.e. during Muriel's life).

■ In addition, Carrier received a second interest, namely a legal remainder in twelve percent of the corpus of the Residuary Trust. Ordinarily, a remainder will be created where there is a conveyance of a particular estate, such as a

---

4. This Comment in the Code is reprinted from the notes which follow the proposed legislation contained in the Second Report of the Governor's Commission to Review and Revise the Testamentary Law of Maryland, also known as the Henderson Report.

life estate or an estate per autre vie, followed by a convey-ance of a future interest which will become a present possessory interest in someone other than the grantor, immediately upon the natural termination of the preceding particular estate created by the same instrument. *See Chism v. Reese,* 190 Md. 311, 321, 58 A.2d 643 (1948); *Myers v. Myers,* 185 Md. 210, 221, 44 A.2d 455 (1945). *See also* § 14-201, defining the term "remainderman," in a trust context, as meaning "any person entitled to principal, including income which has been accumulated and added to principal."

Upon Muriel's death the Residuary Trust terminates, the children's beneficial interests end, and sixty percent of the corpus will be distributed to Victor's three children in varying percentages.[5] The twelve percent share of the corpus which Carrier will receive upon Muriel's death is a remainder because it is a future interest in one other than the grantor which will become a present possessory interest immediately upon the natural termination of the equitable life estate per autre vie established under the Residuary Trust. Carrier's remainder is a *legal* future interest be-cause it was conveyed to her outright and not subject to any trust. *See Numsen v. Lyon,* 87 Md. 31, 40–41, 39 A. 533 (1898) (holding that where a deed conveyed a life estate in trust to a woman, along with a contingent remainder to her descendants who survived her, and if none survived her then a remainder to her heirs, the remainders so conveyed were legal and not equitable). As previously noted, the Comment which follows § 1-101 indicates that an individu-al, who receives a legal future interest under a will, falls within the definition of "interested person." Thus, Sandra Carrier, being a remainderman under her father's will, qualifies as an interested person under § 1-101 by virtue of

---

5. Specifically, William will receive fifty percent of the original sixty percent (a total of thirty percent) of the corpus, Sally will receive thirty percent of the original sixty percent (a total of eighteen percent) of the corpus, and Sandra Carrier will receive twenty percent of the original sixty percent (a total of twelve percent) of the corpus.

the legal remainder conveyed to her in Item 5(A) of the Will.

### B.

■ As Carrier is an "interested person" under § 1–101, we next determine whether the orphans' court correctly construed the meaning and effect of that term as used in § 7–501(a). This section, as already observed, directs the personal representative to "give written notice to all interested persons of the filing of an account with the court;" it was enacted in 1969 as part of the comprehensive revision of Maryland's testamentary law. Prior to 1969, the law did not require that the personal representative give heirs, legatees or other interested persons notice of the filing of an account. *See Richardson v. Billingslea,* 69 Md. 407, 409, 16 A. 65 (1888) (noting that under existing Maryland law, the Personal Representative was not required to give interested parties notice of the filing or the court's acceptance of an account); *Rolfe v. Clark,* 269 Md. 14, 18, 304 A.2d 231 (1973) (noting that "Art. 93 as it existed prior to the passage of Chapter 3 of the Acts of 1969 contained no notice provisions similar to present §§ 7–501 and 7–502").[6] In its Second Report, the Governor's Commission to Review and Revise the Testamentary Law of Maryland (December 5, 1968) noted at 117:

[u]nder the current Maryland law and practice it is possible that in many cases neither the heirs nor the legatees receive any notice whatsoever of the filing of inventories or accounts, and the Commission felt that some form of adequate notice should be given to the persons who might be materially affected. In order that this procedure does not become too cumbersome, authori-

---

6. As one commentary notes, prior to 1969, interested parties were "subject to the practical tyranny of 'record notice' which, under the old law, bound them to know whatever was filed during administration whenever it was filed." Stiller and Redden, *Statutory Reform in the Administration of Estates of Maryland Decedents, Minors and Incompetents,* 29 Md.L.Rev. 85, 112 (1969).

ty is given to the Court to relieve the personal representative from sending the notices to such persons as specific and pecuniary legatees, if it deems the same appropriate.

Thus, under the revised testamentary laws, interested persons, as defined by § 1–101(g) would receive notice of the filing of an account. The Code revisions enacted in 1969, however, did not contain the provision for filing exceptions, which now appears in § 7–501(b). Nevertheless, the orphans' court interpreted the provision for filing exceptions contained in § 7–501(b) as referring to those persons who receive notice under § 7–501(a), namely interested persons. A careful review of the common law regarding the filing of exceptions, as well as the legislative history and express language of the statute, however, indicates that the orphans' court's interpretation of § 7–501(b) is incorrect.

Prior to 1971, the common law dictated the procedures for filing an exception in Maryland. Generally, under the common law, anyone named as a beneficiary under a will or anyone who might possess or derive an interest under a will could object to an account. *See, e.g., In re Estate of Provus,* 30 Ill.App.3d 378, 332 N.E.2d 759, 761 (1975) (finding that persons receiving vested legal remainders under a will had the right to object to the final accounting); *In re Statz' Estate,* 144 Neb. 154, 12 N.W.2d 829, 835 (1944) (noting that "[t]he general rule is that any person beneficially interested in the estate embraced in an administration account may cite the executor or administrator to file an account, object, or file objections to the terms or matters contained in the account, and the representative may in a proper proceeding be surcharged with losses occurring because of a breach of trust"). *See also* 31 Am.Jur.2d *Executors and Administrators* § 521 (1967) ("Any person beneficially interested may file an objection to items contained in an executor's or administrator's account"); 34 C.J.S. *Executors and Administrators* § 884 (1942) ("Any legally competent person or entity interested in the disposition of the property of a decedent embraced in an administration account may object or file exceptions to its allowance").

Maryland's case law is in accord with this view. *See, e.g., Goldsborough v. DeWitt,* 171 Md. 225, 255, 189 A. 226 (1937) (holding that the owner of a life estate, trust beneficiaries, and remaindermen all had standing to challenge the propriety of accounts filed in an estate of which they were legatees); *Helms v. Franciscus,* 2 Bland 544, 559–60 (1830) (finding that husband who might have a claim to part of his wife's legacy under a will had standing to object to an account). *See also* P. Sykes, *Maryland Practice: Probate Law and Practice,* § 870 (1956) (noting that "[a] distributee, a co-executor who gave a joint bond, or a trustee of an insolvent legatee is entitled to an opportunity to contest an account when it is submitted for the court's approval"). As the court explained in *In re Statz' Estate, supra,* the rationale behind this rule rests upon the fact that

> [a]dministration proceedings to settle the estate of a decedent are proceedings in rem, and every person interested in such settlement is a party in the ... court whether he is named or not. He may appear for the purpose of protecting his interests in the ... court. 12 N.W.2d at 835.

Under the common law, therefore, an individual who possessed either a beneficial interest under a trust or a future interest, such as a remainder, would be permitted to object to an account. We now determine whether this rule has been altered by the enactment of § 7–501(b).

Section 7–501(b) was enacted by Chapter 786 of the Acts of 1971. Because this subsection of the statute was not included in the original revision, there are no comments or committee reports which indicate the Legislature's purpose in enacting it. The only indication of legislative intent is contained in the title to the enactment which indicates that the legislative purpose was to effectuate a "change in ... the time within which exceptions to an account must be filed ..." This statement suggests that the Legislature intended that § 7–501(b) establish a specific time period for filing exceptions rather than to limit the class of persons who could file exceptions. This interpretation is supported

by the fact that § 7–501(b) does not use the words "interested person," but rather refers to one filing exceptions only as an "exceptant." [7]

In addition, the express language of § 7–501(b) suggests that individuals, other than interested persons, may file exceptions to an administration account. It specifically refers to exceptions which may be filed as to items described in § 7–502.[8] The notice provision of § 7–502, however, extends to both creditors and interested persons. This reference to creditors in § 7–502 suggests that parties other than interested persons have a right to file exceptions under § 7–501(b).

This interpretation of § 7–502(b) is consistent with case law in other states. For example, in *In re Estate of Provus, supra,* the court also addressed the issue of whether a remainderman of a testamentary trust could file an objection to an account where the controlling statute did "not expressly indicate who may or may not object to an executor's final accounting." 332 N.E.2d at 761. In *Provus,* as in the present case, the personal representatives argued that only those persons who were entitled to receive notice under the notice statute could object to the account. The court rejected this contention, stating:

By its terms, ... [the notice statute] specifies only those persons entitled to receive *notice* of the accounting. Nonetheless, it may be inferred that persons entitled to

---

7. *Compare* § 7–204 which indicates that only "the state or an interested person may petition the court for revision of a value assigned to an item of inventory ..."

8. Section 7–502(a) provides:

*Notice.*—The personal representative shall give written notice to each creditor who has filed a claim under § 8–104 which is still open and to all interested persons of a claim, petition, or other request which could result, directly or indirectly, in the payment of a debt, commission, fee, or other compensation to or for the benefit of the personal representative or the attorney for the estate. The notice shall state the amount requested, and set forth in reasonable detail the basis for the request. It shall also state that a request for hearing may be made within 20 days after the notice is sent.

notice (unpaid creditors and persons entitled to share in the estate who are unpaid) are also entitled to object. However, it does not necessarily follow that only those persons, and no others, may object. *Id.* (emphasis in original).

Instead, the court found that any person having "an interest in maintaining the assets of the estate intact" had a right to object. *Id.* Thus, the court concluded that remaindermen of a testamentary trust were interested persons and had a right to object to the administration account despite the fact that they had not received notice of the filing of the executors' account. *Id.*

■ The present case is similar to *Provus, supra.* Section 7–501(b), like the statute in *Provus,* does not expressly indicate who may object to a personal representative's administration account. The history underlying the enactment of § 7–501(b) suggests that it was enacted merely to establish a time limit for filing exceptions. In addition, the reference to § 7–502 suggests that parties other than interested persons have a right to file exceptions under § 7–501(b). Under these circumstances, § 7–501(b) is more properly construed as providing a limit on the time within which exceptions may be filed, rather than as limiting the class of persons who may file exceptions. Consequently, we find that the common law continues to control the issue of who has standing to file an objection. Because it allows for the filing of exceptions by both beneficiaries of a testamentary trust and remaindermen, we find that Carrier, who is both a trust beneficiary and a remainderman under her father's will, has standing to object to the administration account filed by the Personal Representatives.

## C.

■ The final issue raised by the orphans' court's order is whether Carrier has standing to file an objection to the Personal Representatives' Proposed Schedule of Distribution. Section 9–104(e) provides:

*Right to object.*—After the probable charges against the estate are known, the personal representative may mail or deliver a proposal for distribution to all persons who have a right to object to the proposed distribution. If not waived in writing, the right of a distributee to object to the proposed distribution terminates if he fails to object in writing received by the personal representative within 30 days after mailing or delivery of the proposal.

This section, like § 7–501(a), was enacted in 1969 as part of the revised testamentary Code. The Official Comment which follows this section, and which is reprinted in the Code, does not define who is a distributee and thus who may object to the proposed distribution. The Comment, however, does refer to legatees, by indicating that "[t]he Commission felt that the personal representative could use any reasonable method [for valuing assets], and if the legatee disputed the method of valuation, the legatee would have the opportunity to object."

The Personal Representatives contend that the Comment's reference to legatees indicates that the right to object is limited to legatees. We do not agree. The reference to legatees in the Comment was intended as an example of how the provision would operate and not as a limitation on who may object to a proposed distribution. Thus, we do not construe the reference to legatee contained in the Comment as indicating that the right to object to a proposed distribution under § 9–104(e) is limited to legatees.

 Having concluded that the right to object extends to persons other than legatees, we next consider who, besides legatees, may object to a proposed distribution. Section 9–104(e) does not refer to "interested person" but instead describes any potential objector as a "distributee." [9]

---

**9.** It is likely that the use of the term "distributee" in § 9–104(e), rather than "interested person," indicates a conscious choice not to limit the right to object to a proposed distribution to interested persons. The Comment which follows § 1–101 states that the definition of interest-

This term is not defined in the statute, but various cases have defined the term as meaning an heir, legatee or other party entitled to take a whole or a part of an estate or one who is otherwise entitled to share in the distribution of an estate.[10] *See Register of Wills v. Blackway,* 217 Md. 1, 15, 141 A.2d 713 (1958) (noting that "[t]he word 'distributee' is defined as follows in Black's Law Dictionary: 'An heir; a person entitled to share in the distribution of an estate' "); *Gradman, supra,* 183 Md. at 640, 39 A.2d 808 (noting that "[a] legatee, or distributee, is a party entitled to take the whole or a part of an estate"). We believe that this definition of "distributee" is the proper construction of the term as it is used in § 9–104(e), and thus under that statute any person who will receive the whole or any part of an estate is entitled to object to a proposal for distribution. Consequently, because Carrier will receive a share of her father's estate under Item 5 of the Will, she is a distributee of her father's estate. Thus, she may object to the Proposed Schedule of Distribution filed by the Personal Representatives.

## III.

◼ The Personal Representatives also contend that if Carrier has standing to file objections to the First Account and the Proposed Schedule of Distribution, then the orphans' court lacks jurisdiction to consider the merits of her claims. Specifically, they focus upon Carrier's contention that the Personal Representatives erred in determining that William Schinnerer had satisfied the requirements of the

---

ed person contained in that section was of "considerable importance" because it was used in other sections of the Code. This statement suggests that the term "interested person" had a precise meaning and would only be used in subsequent sections when its invocation was deemed appropriate.

**10.** In *Gradman v. Brown,* 183 Md. 634, 39 A.2d 808 (1944), we defined the word "estate" as meaning "in the testamentary law, such property that passes, upon death, to the personal representative of the decedent." *Id.* at 640, 39 A.2d 808.

first codicil by returning the bonds free of the pledge after Victor's death. As to this, the Personal Representatives say that this is an issue requiring construction of the will, and that the orphans' court lacks the authority to construe a will.

The question of jurisdiction was not raised below. Nevertheless, "matters of jurisdiction are always before this court and are exceptions to the general rule that we will consider only such questions as have been raised and decided below." *Webb v. Oxley*, 226 Md. 339, 343, 173 A.2d 358 (1961), *cert. denied*, 369 U.S. 803, 82 S.Ct. 642, 7 L.Ed.2d 550 (1962). The jurisdiction of the orphans' court is set forth in § 2–102, which states:

(a) *Powers.*—The court may conduct judicial probate, direct the conduct of a personal representative, and pass orders which may be required in the course of the administration of an estate of a decedent. It may summon witnesses. The court shall not, under pretext of incidental power or constructive authority, exercise any jurisdiction not expressly conferred.

As we noted in *Clarke v. Clarke*, 291 Md. 289, 293, 435 A.2d 415 (1981), "an orphans' court is a court of very limited jurisdiction." It is primarily entrusted with the administration of decedents' estates and thus as a general rule the " 'estates of deceased persons should ordinarily be administered and finally distributed in the orphans' courts.' " *Clarke, supra*, 291 Md. at 293, 435 A.2d 415; *quoting, Knox v. Stamper*, 186 Md. 238, 245, 46 A.2d 361 (1946).

In some instances when a case involves matters of will construction, the circuit court will exercise jurisdiction while in others the orphans' court may construe the will. As we explained in *Clarke*,

If a substantial issue as to the meaning of a will exists, involving ambiguous or intricate provisions, construction of the will is generally for the equity court and beyond the authority of the orphans' court.... "The jurisdiction of equity in the construction of wills ... arises from the difficulty of understanding the meaning of complicated

provisions in a will, or the uncertainty as to the rights and interests of the parties claiming under them...."

However, it is settled that some issues of construction are for the orphans' court. Where the language of the will is such "as to permit no reasonable doubt of its meaning ... [,] a court of equity will refuse to construe it," and construction is for the orphans' court. 291 Md. at 294, 435 A.2d 415.

This Court has repeatedly found that the orphans' courts have the power to construe wills for the purpose of determining which persons are to receive property under a will, as well as which assets shall be distributed to them. *See, e.g., Clarke, supra,* 291 Md. at 294, 435 A.2d 415 ("The orphans' court has the power of construction for the purpose of deciding who shall take under a will and what they shall take"); *Davis v. Davis,* 278 Md. 534, 537, 365 A.2d 1004 (1976) (holding that the orphans' court had the power to make "a determination of who is to take under a will or in the disposition of the assets of the estate, a question which is clearly within the jurisdiction of an orphans court"); *Redwood v. Howison,* 129 Md. 577, 592, 99 A. 863 (1917) ("The Orphans' Court has authority 'to hear and determine the question who are next of kin, and to decide between parties claiming adversely to each other, and to determine which of them are next of kin entitled to distribution' ..., and to determine what is to be distributed and who are legatees"). As we explained in *Pole v. Simmons,* 45 Md. 246, 249–50 (1876):

[Section 2–102] confers full power on the Orphans' Court to take probate of wills, grant letters testamentary and of administration, direct the conduct and settling of the accounts of executors and administrators, superintend the distribution of the estates of intestates, secure the rights of orphans and legatees, and to administer justice in all matters relative to the affairs of deceased persons. Under this section, we think it clear the Orphans' Court had jurisdiction of the matter presented by the petition, for it would be impossible to superintend and make distribution

of the estate without the authority to determine what was to be distributed; and this necessarily involves the questions as to what are assets, and, when there is a will, who are the legatees, and what is given to them by the will. Having jurisdiction of the subject-matter of the controversy, the Orphans' Court has the right to hear and receive evidence in relation to it; and, if the evidence consists of written instruments, to examine and construe them, in order that it may properly apply it to the case before it.

Thus, we have held that the orphans' court may construe a will to the extent that it is necessary to perform its function of approving an account of an executor by which payments of legacies were made. *See, e.g., Hagerstown Trust Co., Ex. of Mealey,* 119 Md. 224, 232–33, 86 A. 982 (App.1913). We have also held that the court may construe a will to determine the testator's intent in making a particular bequest, *see Longerbeam v. Iser,* 159 Md. 244, 247, 150 A. 793 (1930), and that the orphans' court may construe a will to determine if a codicil modified a bequest contained in the will, *see Estate of Childs v. Hoagland,* 181 Md. 550, 551–52, 30 A.2d 766 (1943).

In her exceptions to the proposed schedule of distribution, Carrier contended that the Personal Representatives erred in interpreting the language of the First Codicil as not intending a forfeiture of William's bequest when he had paid the loans in full without resort to estate assets or the pledged collateral. As indicated, the orphans' court has the power to construe a will or codicil to the extent that it is necessary to determine what are estate assets, which of these assets are included in a bequest, and who is to take property under a bequest. *See Clarke, supra,* 291 Md. at 294, 435 A.2d 415. In this case, Carrier is asking the orphans' court to construe the First Codicil to determine whether William is to receive all the bequests made to him in his father's will, as the Personal Representatives contend, or if those bequests are to be reduced by the amount of the assets not returned to Victor prior to his death. This determination falls within the scope of the orphans' court's

power to determine who will receive assets of an estate, as well as what property that party will receive; in this case the power is exercised incidental to the orphans' court's power to approve the Proposed Schedule of Distribution and its power to superintend the distribution of the estate. We, therefore, find that the orphans' court has jurisdiction to decide the issues raised by Carrier's exceptions.

## IV.

 Because the orphans' court found that Carrier lacked standing to file the exceptions, it struck her pleadings and therefore did not reach the merits of her claims. Under Maryland Rule 8-131, we may decide issues which have been raised but not decided by the trial court. In many cases, however, it is not desirable to address an issue without the benefit of its having been examined and first resolved by the lower court. *See, e.g., Morgan v. Dietrich,* 178 Md. 66, 70, 12 A.2d 199 (1940) (declining to decide the issue of estoppel where it had not been passed upon by the orphans' court). We think the interests of the parties and the court in the present case would best be served by remanding the matter to the orphans' court for a full consideration of the issues raised in the exceptions filed by Carrier.

ORDER OF THE ORPHANS' COURT FOR ANNE ARUNDEL COUNTY VACATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.