849 A.2d 504

**TIERCO MARYLAND, INC.**

v.

**Linda WILLIAMS, Charles Smith, Katrina Smith, Shaniqua Smith, and Frances Williams.**

**No. 65, Sept. Term, 2003.**

Court of Appeals of Maryland.

May 14, 2004.

Reconsideration Denied June 16, 2004.

380

James T. Ferrini (Paul V. Esposito of Clausen Miller, P.C., Chicago, IL; Pamela A. Bresnahan and Steven R. Becker of Vorys, Sater, Seymour and Pease LLP, Washington, DC), on brief, for Petitioner.

Paul W. Spence (Spence, Kohler & Christie, P.A., Towson; Emanuel M. Levin of Emanuel M. Levin & Associates, P.A., Baltimore), on brief, for Respondents.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

HARRELL, Judge.

It should surprise no one that a fundamental jurisprudential principle is that irrelevant considerations may not be a proper basis for a jury's verdict. In this civil action asserting theories of recovery based solely on assault, battery, false imprisonment, and negligent supervision, as submitted to the jury, the Respondents/Plaintiffs repeatedly raised at trial, through argument and testimony, insinuations of racial discrimination by at least some of the corporate defendant's alleged employees. Because the record demonstrates a significant probability that the jury's award to Respondents/Plaintiffs of substantial compensatory and punitive damages was induced by irrelevant racial considerations, we shall reverse the judgment and remand the case to the Circuit Court for Prince George's County for a new trial. In so doing, we also shall unsnare a procedural trap for the unwary.

## I.

On 31 July 1999, Eddie and Linda Williams took their children and grandchildren on a family outing to Six Flags America ("Six Flags"), an amusement park in Prince George's County, Maryland.[1] Mr. and Mrs. Williams were joined at the

---

1. Petitioner in this case is Tierco Maryland, Inc. Respondents claim that Tierco operates Six Flags and is responsible for the actions of the

park by their daughters, Frances Williams and Katrina Smith, along with Katrina's husband, Charles Smith. With them also were two grandchildren: Frances Williams's two-year-old son, Daquan, and Shaniqua Smith, the four-year-old daughter of Katrina and Charles Smith. After several hours of enjoying the amusement park's other attractions, the family decided to ride the Typhoon Sea Coaster ("the ride"), a hybrid roller coaster/log flume ride. Daquan, it was decided by the adults, was too young to go on the ride, so he was left in the care of his grandfather while the rest of the family joined the queue for the ride.

The summer day was hot, and the wait was long for the ride. After about an hour in the queue, Linda Williams, Frances Williams, Katrina Smith, Charles Smith, and Shaniqua Smith ("Respondents") reached the ride's loading station. As they approached the ride's boats, a ride attendant carrying an L-shaped measuring stick indicated to the ride operator that Shaniqua did not meet the ride's forty-six inch minimum passenger height requirement. The ride operator stopped the ride.

A different ride attendant approached Respondents, who had seated themselves in one of the ride's boats. The second ride attendant explained to Respondents that he believed that Shaniqua was not tall enough to go on the ride, and that the ride would not be restarted until she left the boat. Respondents refused to leave the boat, insisting that Shaniqua be allowed to ride. Respondents claimed they had seen "white children"[2] smaller than Shaniqua allowed on the ride without being stopped by park attendants and, therefore, Shaniqua

---

park employees mentioned in the complaint. Tierco denies responsibility and claims that the trial court erred by entering judgment against Tierco without a sufficient factual record supporting Tierco's responsibility for the conduct of the Six Flags employees. For ease of reference, the amusement park and its employees sometimes will be referred to collectively in this opinion as "Six Flags." Whether Tierco is responsible for the actions of those employees is commented on, but not decided, in part IV of this opinion.

**2.** Respondents are African Americans.

should be allowed to ride.[3] A standoff ensued, during which several additional park employees, including managers and security personnel, arrived on the scene.

After ten or fifteen minutes,[4] Respondents agreed to leave the boat they occupied. Most of the events that followed were disputed at trial by the parties.

Witnesses for Six Flags testified that, just after leaving the boat, Charles Smith threw a punch at a Six Flags employee. Mr. Smith denied such aggressive conduct. Witnesses for both Respondents and Six Flags testified that Charles Smith was "thrown to the ground," restrained, and handcuffed by Six Flags security staff. Witnesses for Six Flags testified that Linda Williams, Frances Williams, and Katrina Smith, while attempting to pull the security staff off Charles Smith, became violent with Six Flags employees. Witnesses for both sides testified that Linda Williams, Frances Williams, and Katrina Smith were restrained and handcuffed. Respondents were then forced to walk approximately one thousand feet within the park to the park security office. During this walk, conducted in plain view of other park patrons then present, each Respondent, with the exception of Shaniqua, was handcuffed.

Respondents sat in the security office for about an hour. During that time, Six Flags employees issued "trespass letters" to Respondents, informing them that they no longer were welcome on the amusement park property. Park employees also called the Prince George's County Police Department, which dispatched an officer to the scene. When the police officer arrived, he immediately removed the handcuffs from Respondents and they were escorted to the park gate, where they were released.

---

**3.** Later, after the ride had been restarted, park employees testified they measured all of the child patrons stranded on the ride during the standoff. There were no children shorter than forty-six inches on the ride.

**4.** During this time, the ride was stopped and an estimated eighty park patrons were stranded at various locations along the course of the ride with no opportunity to leave their boats.

The family drove to a local hospital where they were examined and underwent various tests. The doctors found cuts and bruises on one of Charles Smith's elbows and his chest, but no fractured bones. Charles also complained to them of muscular soreness in his chest. Katrina complained of swollen wrists and sore shoulders from being handcuffed, as did Linda Williams. There were no other physical injuries identified at that time.

Respondents sued Six Flags in the Circuit Court for Prince George's County, alleging assault, battery, false imprisonment, and negligent supervision. Respondents did not allege in the complaint racial animus on the part of Six Flags or its employees. Indeed, no mention of race appeared at all in the complaint. Nevertheless, race became a major focus of the trial. Race, or a particular race, was mentioned sixty-three times during the three day trial.[5]

Aside from the physical injuries described above, Respondents' main complaints in the suit, were for embarrassment, public humiliation, and upset feelings. Linda Williams also alleged the loss of two days of work as a nurse. No evidence of permanent injuries of any type suffered by any Respondent was adduced at trial. The jury awarded Respondents collectively $1,000,000 in compensatory damages[6] and $1,500,000 in punitive damages against "Six Flags." Judgment in those amounts was ultimately entered against Tierco. The trial judge, granting in part Tierco's post-judgment motions, vacated the punitive damages award because she concluded that the jury's finding of actual malice was not supported by the evidence.

Disposing of Tierco's direct appeal, the Court of Special Appeals, in an unreported opinion, reinstated the original jury

---

5. This number is based on our careful, but unscientific, review of the record. *See* part III, *infra*.

6. The jury awarded $250,000 in compensatory damages to Charles Smith, $200,000 to Katrina Smith, $250,000 to Shaniqua Smith, $100,000 to Frances Williams, and $200,000 to Linda Williams.

verdict and dismissed Petitioner's appeal.[7] We granted Tier-co's petition for a writ of certiorari, 377 Md. 111, 832 A.2d 204 (2003), to consider the following five questions:

1. Did the Court of Special Appeals err in denying Petitioner's motion to voluntarily dismiss its appeal without prejudice and subsequently improperly exercise appellate jurisdiction over the case, where judgment had not been entered against all of the parties below and there was more for the trial court to do?

2. Did the Court of Special Appeals erroneously dismiss Petitioner's appeal as untimely under the Maryland Rules?

 a. Did the Court of Special Appeals, in dismissing the appeal, misinterpret Maryland Rule 2–532 to require the entry of "final judgment"—as opposed to the Rule's stated condition of "entry of judgment on the verdict"—as a prerequisite to the timely filing of a motion for judgment notwithstanding the verdict ("JNOV")?

 b. Should the *dictum* in the Court of Special Appeals's ruling in *Atlantic Food & Beverage Systems, Inc. v. Annapolis,* 70 Md.App. 721, 523 A.2d 648 (1987), which has been applied so as to require entry of final judgment before a motion for JNOV may be filed, be overruled because it constitutes an erroneous interpretation of the plain reading of the Rules and creates a trap for the unwary?

---

**7.** Respondents challenged, in the intermediate appellate court, the timeliness of Tierco's post-judgment motions before the trial court. Because the Court of Special Appeals agreed that the post-judgment motions were filed prematurely, it reversed the trial court's resolution of those post-judgment motions. The Court of Special Appeals concluded that it did not have appellate jurisdiction over the case generally and, therefore, did not reach Petitioner's questions or Respondents' cross-appeal.

We observe, however, if the Court of Special Appeals was correct that it lacked jurisdiction to consider the case at all, it follows that it lacked jurisdiction to reinstate the jury's punitive damages award. *See Lewis v. Lewis,* 290 Md. 175, 180, 428 A.2d 454, 457 (1981) (an appellate court may not decide an issue if it lacks jurisdiction to consider a case.)

3. Did the trial court err in denying Petitioner's motions for JNOV, for a new trial or for remittitur, where Respondents' counsel repeatedly utilized race to prejudice and impassion the jury and the verdict was so excessive in light of the *de minimus* injuries that the verdict can only reasonably be viewed as having been the product of the jury's prejudice and passion?

4. Was the compensatory damages verdict, totaling one million dollars, so far from the range of verdicts in similar cases that it was an abuse of discretion of the trial court to refuse to order remittitur?

5. Was judgment erroneously entered against Petitioner, where Respondents failed to prove that Petitioner was the employer of the alleged malfeasants?

## II.

The first issue we must address is whether the Court of Special Appeals erred in concluding that it lacked jurisdiction to consider Petitioner's appeal because of a "premature" post-judgment motion (or motions). Although the pertinent Maryland Rules, as currently framed and as interpreted by an earlier reported opinion of the Court of Special Appeals, supply fertile soil for the conflicting arguments offered in the present case, we conclude that the post-judgment motions in the present case were not untimely and, therefore, the Court of Special Appeals should have exercised appellate jurisdiction in this case.

The underlying relevant facts are straightforward. From the inception of the suit in the Circuit Court, Respondents included Shaniqua's grandfather, Eddie Williams, as a plaintiff. Ultimately, however, because Mr. Williams was not present during the events occurring at the Typhoon Sea Coaster on 31 July 1999 (*supra* at 2), Respondents' counsel voluntarily dismissed Mr. Williams's claims immediately prior to opening statements during the first day of trial on 29

October 2001.[8] The dismissal, although noted in the trial transcript, was not contemporaneously docketed or memorialized by a written order or writing.

The jury's verdict in favor of Respondents was returned on 31 October 2001. The trial court, however, took several months before entering judgment against Tierco. The delay was caused by the need to determine the identity of the correct defendant against whom a judgment on the verdict should be entered. Respondents named numerous business entities as defendants in the complaint. At trial, however, the entities generically were referred to only as "Six Flags" (for more discussion of this, see part IV *infra* ).

After this was resolved, Respondents submitted proposed written judgments for those claims that were the subject of the 31 October 2001 verdict. The submitted judgments were signed by the trial judge on 15 February 2002 and entered on the docket on 21 February 2002. Tierco filed a post-judgment motion for judgment notwithstanding the verdict (JNOV), under Maryland Rule 2–532, on 25 February 2002.[9]

Respondents' attorneys indicated their intent to submit a proposed written judgment dismissing Eddie Williams's claims along with the other judgments signed on 15 February 2001, and led counsel for Tierco to believe they had done so. In fact, through presumed inadvertence, no writing memorializing the judgment dismissing Eddie Williams's claims accompanied the other written judgments. Believing that there could be no ultimate final judgment in the case until Eddie Williams's claims were resolved finally, Respondents, upon

---

**8.** The attached Appendix of the pertinent chronology (*infra* at 421, 849 A.2d at 530–31) was created for ease of reference.

**9.** Throughout these proceedings, Tierco's motions have been referred to by the parties, the Circuit Court, and sometimes the Court of Special Appeals as "post-trial motions," which, of course, they were. The more precise term, and the one used in Maryland Rule 2–532, however, is "motion for judgment notwithstanding the verdict." The term "post-judgment" motion, therefore, is preferable to "post-trial" motion because the focus of the motion is on the judgment and not on the trial or the verdict.

discovering the omission, submitted a proposed writing dismissing Eddie Williams's claims on 27 February 2002, two days after Tierco filed its initial motion for JNOV.

Tierco filed an amended post-judgment motion ("the second motion") on 4 March 2002. On the same day, the trial judge signed the written judgment dismissing Eddie Williams's claims. That judgment was entered on the docket on 7 March 2002.[10]

On 6 March 2002, the parties submitted to the trial court a joint "briefing" schedule regarding the issues raised in Tierco's post-judgment motions. In that document, the parties noted: "On February 25, 2002, defendant filed a post-judgment motion. This was done for prophylactic reasons. Defendant filed an amended motion on March 4, 2002, and may re-file it once judgment is entered as to Eddie Williams. This will not affect the proposed schedule." Tierco, however, did not file (or "re-file") a third post-judgment motion after the entry of judgment as to Eddie Williams's claims.

Respondents urged, and the Court of Special Appeals agreed, that both the 25 February 2002 and the 4 March 2002 post-judgment motions were nullities and had no legal effect because they were filed prior to the existence of a final judgment in the case.[11] For support, they pointed to *Atlantic Food and Beverage Systems, Inc. v. Annapolis,* 70 Md.App. 721, 523 A.2d 648 (1987), where the Court of Special Appeals concluded that Rule 2–534[12] does not authorize the filing of

---

**10.** Strangely, although Tierco's second post-judgment motion was entered on the docket on an earlier date than the written judgment as to the dismissal of Eddie Williams's claims, the former carried trial docket number 97 while the latter carried docket number 94.

**11.** We note that Respondents did not advance this contention in their 25 March 2002 opposition to Tierco's post-judgment motion. They argued, for the first time, in a 26 April 2002 motion to strike the post-judgment motion that Tierco's motions were premature.

**12.** In an action decided by the court, on motion of any party filed *within ten days after entry of judgment,* the court may open the judgment to receive additional evidence, may amend its findings or

post-judgment motions until the case concludes with a final judgment as to all parties and claims. Rule 2–534 has nearly identical language relating to the timing of post-judgment motions as Rule 2–532(b),[13] the Rule under which Tierco purported to file its motions.

The intermediate appellate court dismissed Tierco's appeal and reinstated the judgments based on the jury's verdict, including the punitive damages award vacated by the trial judge, reasoning that neither post-judgment motion was filed after final judgment was entered in this case, and that the motions and the action thereon had no legal effect.[14] This meant that Tierco's notice of appeal, filed on 14 June 2002, was untimely because the premature post-judgment motions had not tolled the time requirement for noting an appeal.

Respondents and the Court of Special Appeals are correct that there was no final judgment in this case on 4 March 2002, when Tierco filed its second and final post-judgment motion. We disagree, however, with the conclusion, based on Respondents' reading of *Atlantic Food,* that the lack of a final judgment as to all claims of all parties made nullities of Tierco's motions and the trial court's partial grant thereof.

A post-judgment motion of the type filed in the present case may be filed within ten days of the judgment or judgments it seeks to alter or upset, which judgment or judgments might

---

its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial.
Md. Rule 2–534 (emphasis added).

13. The motion shall be filed *within ten days after entry of judgment* on the verdict or, if no verdict is returned, *within ten days after* the discharge of the jury. If the court reserves ruling on a motion for judgment made at the close of all the evidence, that motion becomes a motion for judgment notwithstanding the verdict if the verdict is against the moving party or if no verdict is returned.
Md. Rule 2–532(b) (emphasis added).

14. By rule, a court has no discretion to extend the time for filing a post-judgment motion or to rule on an untimely post-judgment motion. Md. Rule 1–204(a).

not be the final judgment in the case. Some of the reasoning in *Atlantic Food* presents a trap for the unwary, with which we do not subscribe. The judgments to which Tierco's post-judgment motions were directed—those based on the jury verdict—were entered on 21 February 2002. Tierco had ten days from that date in which to file its motion. It filed its original motion on 25 February 2002 and its amended motion on 4 March 2002, both within the time limit established by Rule 2–532(b), taking into account the prescribed method for computing the ten days. For that reason, its post-judgment motions were not premature.

## A.

On 4 March 2002, when Tierco filed its second and last post-judgment motion, there was no final judgment because no written judgment had been entered dismissing the claims of Eddie Williams. Tierco argues nonetheless that Eddie Williams's voluntary dismissal by counsel in open court on 29 October 2001, accepted by the trial judge and opposing counsel, was a final resolution of his claims. Thus, as Tierco's argument goes, nothing more needed to be done to formalize the disposition of Mr. Williams's claims. This argument is without merit.

According to Rule 1–202, "any order of court final in its nature entered pursuant to these rules" is a "judgment." Rule 2–601 governs the entry of judgments in civil cases in the circuit courts:

(a) Prompt Entry—Separate Document. Each judgment shall be set forth on a separate document. Upon a verdict of a jury or a decision by the court allowing recovery only of costs or a specified amount of money or denying all relief, the clerk shall forthwith prepare, sign, and enter the judgment, unless the court orders otherwise. Upon a verdict of a jury or a decision by the court granting other relief, the court shall promptly review the form of the judgment presented and, if approved, sign it, and the clerk shall forthwith enter the judgment as approved and signed. A

judgment is effective only when so set forth and when entered as provided in section (b) of this Rule. Unless the court orders otherwise, entry of the judgment shall not be delayed pending determination of the amount of costs.

(b) Method of Entry—Date of Judgment. The clerk shall enter a judgment by making a record of it in writing on the file jacket, or on a docket within the file, or in a docket book, according to the practice of each court, and shall record the actual date of the entry. That date shall be the date of the judgment.

(c) Recording and Indexing. Promptly after entry, the clerk shall (1) record and index the judgment, except a judgment denying all relief without costs, in the judgment records of the court and (2) note on the docket the date the clerk sent copies of the judgment in accordance with Rule 1–324.

According to the rule, there can be no judgment without a written record in the case file and a docket entry. *See, e.g., Taha v. Southern Mgmt. Corp.*, 367 Md. 564, 790 A.2d 11 (2002). The first written judgment reflecting Eddie Williams's dismissal was entered on 7 March 2002, three days after Tierco filed its second post-judgment motion. Nevertheless, Tierco argues that the 29 October 2001 dismissal of Eddie Williams, although not memorialized in writing until 7 March, was a final disposition of his claims.

On the first day of trial, after completion of the jury selection process, the trial judge asked the parties "Are we ready for the jury?" A series of motions followed, including this interchange:

"[RESPONDENTS' ATTORNEY]: [W]e have determined that we are going to request a motion to dismiss Mr. Eddie Williams as a party."

"THE COURT: Which turns him into a witness, which means he has to be sequestered. Is that why we are doing it now?"

\* \* \*

"[TIERCO'S ATTORNEY]: Is he going to testify?"

"[RESPONDENTS' ATTORNEY]: Yes"

"[TIERCO'S ATTORNEY]: As long as he's testifying, you can wipe him off the plate."

"THE COURT: Dismiss Eddie Williams."

As explained previously, no notation of this event was docketed, nor was any document placed in the court's case file that indicated the dismissal of Eddie Williams as a plaintiff until 7 March 2002.

■ Voluntary dismissals are governed by Rule 2–506:

(a) By Notice of Dismissal or Stipulation. Except as otherwise provided in these rules or by statute, a plaintiff may dismiss an action without leave of court (1) by filing a notice of dismissal at any time before the adverse party files an answer or a motion for summary judgment or (2) by filing a stipulation of dismissal signed by all parties who have appeared in the action.

(b) By Order of Court. Except as provided in section (a) of this Rule, a plaintiff may dismiss an action only by order of court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded prior to the filing of plaintiff's motion for voluntary dismissal, the action shall not be dismissed over the objection of the party who pleaded the counterclaim unless the counterclaim can remain pending for independent adjudication by the court.

(c) Effect. Unless otherwise specified in the notice of dismissal, stipulation, or order of court, a dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a party who has previously dismissed in any court of any state or in any court of the United States an action based on or including the same claim.

(d) Costs. Unless otherwise provided by stipulation or order of court, the dismissing party is responsible for all costs of the action or the part dismissed.

Tierco notes that, although Rule 2–506(a) requires either a notice of dismissal or a signed stipulation, either of which presumably would be written, nothing in Rule 2–506(b) explicitly requires that a court order dismissing a party be in writing. Nonetheless, an order dismissing a claim is an "order of court final in its nature." The Rule 1–202 definition of "judgment" accommodates several kinds of orders, final in nature, that are susceptible of losing their finality by subsequent timely action. *See Medical Mut. Liab. Ins. Soc. of Maryland v. Davis,* 365 Md. 477, 483–84, 781 A.2d 781, 784–85 (2001). For example, "when a motion to alter or amend an otherwise final judgment or a motion for a new trial is filed within ten days after the judgment's entry, the judgment loses its finality for purposes of appeal." *B & K Rentals and Sales Co., Inc. v. Universal Leaf Tobacco Co.,* 319 Md. 127, 132, 571 A.2d 1213, 1216 (1990) (formatting omitted) (quoting *Unnamed Attorney v. Attorney Griev. Comm'n,* 303 Md. 473, 486, 494 A.2d 940, 946 (1985)); *see also Davis,* 365 Md. at 483, 781 A.2d at 784. Dismissals are no different. There can be no final judgment until every claim is resolved, and dismissal is one of the means by which claims may be resolved for the purposes of the pending litigation.

■ The dismissal of Eddie Williams's claims was a judgment governed by Rule 2–601 requirements that "the clerk shall forthwith prepare, sign, and enter the judgment, unless the court orders otherwise" and that the clerk docket, enter, and record the judgment. This process was not completed until judgment was entered on 7 March 2002. The trial judge's approval of Respondents' dismissal of Eddie Williams as a plaintiff on 29 October 2001 did not satisfy the requirements of Rule 2–601 and, therefore, was not a completed judgment as to his claims. Without a judgment—an order final in its nature—concluding Eddie Williams's claims, there could be no final judgment in the case. The final judgment would have been completed on 7 March 2002, with the entry of a written final order disposing of Eddie Williams's claims.

We repeatedly have stated that the value of docket entries making public the disposition of each claim in a case "cannot

be overemphasized." *Mateen v. Saar,* 376 Md. 385, 396, 829 A.2d 1007, 1013 (2003). Litigants and the public ought to be able to look at a case file or docket and determine when any judgment was entered. *See Davis v. Davis,* 335 Md. 699, 716–17, 646 A.2d 365, 373 (1994). They also should be able to determine by reviewing those records the disposition of any claims that have been resolved. These principles apply to dismissals as well as other means of disposing of claims.

 The requirements of Rule 2–601, unlike some of the other rules discussed *infra,* are neither burdensome nor obscure. According to Rule 2–601, each dismissal must be memorialized by a document in the case file. The word "judgment" need not appear on the document. *Prince Philip Ptshp. v. Cutlip,* 321 Md. 296, 301–02, 582 A.2d 992, 994 (1990). Nor is the judge necessarily required to sign an order of voluntary dismissal, which is a judgment that denies all relief. The document need only put litigants and the public on notice that the claim has been resolved. It must also be docketed, entered, and recorded by the clerk. These steps ensure that litigants, third parties, and the public have access to the disposition of every civil claim brought in Maryland's circuit courts.

### B.

Although there was no final judgment as to all claims and parties when Tierco filed its post-judgment motions, the motions were not untimely. Existence of a final judgment as to all claims and parties is not a prerequisite to the filing of a post-judgment motion under Rule 2–532. Rule 2–532(b) governs the time for filing a motion for judgment notwithstanding the verdict: "The motion shall be filed within ten days after entry of judgment on the verdict or, if no verdict is returned, within ten days after the discharge of the jury." Rules 2–533 (Motion for new trial) and 2–534 (Motion to alter or amend a judgment) have similar language regarding the timing of those post-judgment motions.

Respondents rely on *Atlantic Food and Beverage Systems, Inc. v. Annapolis,* 70 Md.App. 721, 523 A.2d 648 (1987), to argue that civil post-judgment motions may not be filed before all claims are reduced to a final judgment. In *Atlantic Food,* the trial judge filed a written opinion on 21 February 1986 explaining why he decided to affirm a decision of the City of Annapolis Board of Appeals, and explaining that he would do so in a separate order to be drafted by the parties. Atlantic Food, under Rule 2–534, filed a motion to alter or amend judgment on 28 February 1986. On 3 March 1986, the order affirming the City's decision was finally entered on the docket. The trial judge nevertheless ruled on Atlantic Food's motion thereafter by denying it. 70 Md.App. at 723, 523 A.2d at 649.

The Court of Special Appeals in *Atlantic Food* vacated the trial judge's ruling on the motion to amend or alter judgment, holding that the post-judgment motion was filed prematurely because it sought to alter or amend a judgment that had not been entered at the time the motion was filed. 70 Md.App. at 724, 523 A.2d at 649–50. The intermediate appellate court, construing Rule 2–534, which requires that motions to alter or amend a judgment be filed "within ten days after entry of judgment," stated that the Maryland Rules require "a moving party to await final judgment before it attempts to file a motion to alter or amend that judgment." 70 Md.App. at 728, 523 A.2d at 652. The court reached this conclusion even though the words "final judgment" do not appear in Rule 2–534.[15]

---

**15.** Given the lack of detail supplied in the Court of Special Appeals's opinion in *Atlantic Food* concerning the precise nature of Atlantic Food's claim or claims against the City of Annapolis Board of Appeals in the Circuit Court action, we cannot state with certainty whether the suit was in the nature of what was then called an appeal from the decision of an administrative agency (now termed a petition for judicial review of an administrative agency action (*see* Title 7, Chapter 200 of the Maryland Rules)). It does appear, however, from a docket entry recited in the appellate opinion that the case was an "appeal." Regardless, it appears that the Circuit Court in *Atlantic Food* disposed of the case before it by virtue of its 21 February 1986 written opinion and memorializing order of 3 March 1986. Thus, *Atlantic Food* involved but a single claim by a single party, i.e., the Board of Appeals erred in

■ If the conclusion reached by the Court of Special Appeals in *Atlantic Food* was that a motion under Rule 2–534 only may be filed in response to a final judgment as to all of the claims of all of the parties in a case, it is unsupported by the plain language of the rule or by the intention of the rule.

> With respect to the interpretation of the Maryland Rules, this Court has stated that the canons and principles which we follow in construing statutes apply equally to an interpretation of our rules. In order to effectuate the purpose and objectives of the rule, we look to its plain text. To prevent illogical or nonsensical interpretations of a rule, we analyze the rule in its entirety, rather than independently construing its subparts. If the words of the rule are plain and unambiguous, our inquiry ordinarily ceases and we need not venture outside the text of the rule.

*Bern–Shaw Ltd. Ptshp. v. Mayor of Baltimore*, 377 Md. 277, 297–98, 833 A.2d 502, 514 (2003) (citations and formatting omitted). The plain language of Rules 2–532, 2–533, and 2–534 establishes that, in context, the word "judgment" means the judgment on the particular claim that is the object of the post-judgment motion.[16] This is most apparent in Rule 2–532(b): "The motion shall be filed within ten days after entry of judgment on the verdict or, if no verdict is returned, within ten days after the discharge of the jury." The focus is on the

---

deciding against Atlantic Food and should be reversed. Necessarily then, in that case, the appealability of the Circuit Court's judgment was inextricably bound up with whether the timeliness of the filing of the post-judgment motion, thus tolling the finality of that judgment as to the single party's single claim. The question presented therefore was whether the post-judgment motion based on that judgment, which motion was filed after the trial court announced its decision, but before entry of judgment, was filed prematurely.

16. In contrast, the word "judgment" in Rule 8–202(a), governing the timing for filing a notice of appeal, refers to a final, appealable judgment. *See* Maryland Code (1973, 2002 Repl.Vol.), § 12–301 of the Courts & Judicial Proceedings Article; *Bd. of Liquor License Comm'rs for Baltimore City v. Fells Point Café, Inc.*, 344 Md. 120, 129, 685 A.2d 772, 776 (1996)

"judgment on the verdict," not on any other judgment that may be required before a final, appealable judgment exists.

Though less obvious, the same holds for Rules 2–533 and 2–534. Rule 2–533 reads:

> Any party may file a motion for new trial within ten days after entry of judgment. A party whose verdict has been set aside on a motion for judgment notwithstanding the verdict or a party whose judgment has been amended on a motion to amend the judgment may file a motion for new trial within ten days after entry of *the judgment notwithstanding the verdict or the amended judgment.*

Rule 2–533 (emphasis added). The highlighted language focuses on a particular judgment notwithstanding the verdict or a particular amended judgment, not necessarily the final judgment in the case. The implication is that the word "judgment" in the first sentence of the rule also applies to a particular judgment, and not necessarily the final judgment. There is no reason to believe that either the Rules Committee or this Court intended to force a litigant seeking a new trial based on an original trial verdict reduced to judgment to await the entry of final judgment before filing a Rule 2–533 motion, while a litigant filing a similar motion based on a judgment that was changed since the original verdict must file immediately. Read with those principles in mind, the "judgment" referred to in the first sentence of Rule 2–533 refers to the particular judgment derived from trial that the party seeks to challenge, but not necessarily a final judgment as to all claims by all parties. This should not be construed, however, as meaning that a party who, within ten days following entry of final judgment on all claims of all parties, files a post-judgment motion does so untimely.

Of the three civil post-judgment motions rules, Rule 2–534 is the most ambiguous.[17] Rule 2–534 reads:

---

17. It is little surprise, therefore, that the interpretation by the Court of Special Appeals in *Atlantic Food* came in a case construing Rule 2–534. Moreover, the court's analysis in *Atlantic Food* offered no discussion of

In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open *the judgment* to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend *the judgment,* or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial.

The use of the phrase "the judgment" indicates that the judgment referred to in the first sentence is the particular judgment to which the motion is directed. More importantly, for the sake of consistency, we interpret the timing consideration for the filing of post-judgment motions based on Rule 2–534 to be the same as those of its sister rules, Rules 2–532 and 2–533. Rule 2–534 motions also may be filed within ten days of the judgment or judgments the filing party seeks to alter or amend.

The conclusion we draw from the plain language of these rules is that entry of final judgment as to all claims of all parties in a civil case is not necessarily a requirement for the filing of post-judgment motions. Though we are not required to scrutinize extrinsic sources when the plain language of the rules is unambiguous, the minutes of this Court's Standing Committee on Rules of Practice and Procedure (the Rules Committee) provide further support for our conclusion.

The pertinent rules of the Maryland Rules of Procedure, in their current format, were adopted on 6 April 1984 and took effect, replacing the previous organizational structure, on 1 July 1984. *See* Md. Rules, Vol. 1, Orders Adopting Rules of Practice and Procedure, at 7 (2004). The Rules adopted by the Court of Appeals through that order were drafted by the Rules Committee. The Committee's 18–19 June 1982 minutes indicate that the members discussed the meaning of the word "judgment" as it was used throughout the draft rules. The

the abundant legislative history from the Standing Committee on Rules of Practice and Procedure regarding the relevant rules.

"chapter 500" rules relating to civil trial practice in the circuit courts (today Rules 2–501 through 2–551) used the word "judgment" to refer to any final order that resolved a claim. In contrast, the "chapter 600" rules relating to judgments (today Rules 2–601 through 2–652) were crafted, up to that date, with the word "judgment" referring only to a final, appealable judgment as to all claims. Rules Committee members recognized that these different constructions of the word could lead to problems:

> Judge McAuliffe explained that ... [r]ead together these rules have the effect of potentially postponing consideration of post trial motions until many months after the pertinent decisions. *In order to avoid this result* two options appear available. Provisions can be added to all relevant trial rules signifying that in multiple parties or claims cases, or where part of a claim is being determined, parties may move for entry of an order and when such an order is entered the post judgment motions periods will commence to run as to the parties and claims thereby covered. The other alternative is to leave the trial rules alone and redraft [the "chapter 600" rules] so as not to prohibit the entry of a judgment in these cases, but to provide that any order or judgment entered will not be final and appealable unless certified.

18–19 June 1982 Minutes of the Court's Standing Committee on Rules of Practice and Procedure, at 47 (emphasis added). The Rules Committee ultimately decided to recommend to the Court Judge McAuliffe's second option, and to re-draft the "chapter 600" rules relating to judgment in order to incorporate the idea that any order final in its nature entered under the rules is a judgment for purposes of post-judgment motions practice, but only a judgment that resolves all claims is a final, appealable judgment. The Court adopted the Rules Committee's proposed language for the rules.

Plainly, the Rules Committee and the Court sought to avoid a result that potentially postponed consideration of post-judgment motions until months after the pertinent judgments had been entered. In so doing, the Committee and the Court ratified the practice in the circuit courts at the time.

> Prof. Bowie proposed resolving the problem under discussion by *incorporating* [into the "chapter 600" rules] the federal concept of an interlocutory judgment. The acting Chairman indicated that under present practice such interlocutory decisions are termed judgments, or verdicts, *nisi*. Judge McAuliffe proposed using the unembellished term "judgment" for all such determinations and simply advising litigants by applicable rule that a judgment rendered for less than all claims or parties, or for less than an entire claim, is not a "final" judgment unless certified. He highlighted the fact that under the present rules post trial motions periods run from the judgment, or verdict, *nisi* with the result that such motions are heard and considered when matters relative to the trial are fresh.

*Id.* at 45. It seems desirable that post-judgment motions be heard and considered when matters relative to the challenged judgment are fresh in order to ensure that they are resolved promptly. To this end, post-judgment motions may be filed within ten days of the entry of the judgment or judgments they seek to change.[18]

Tierco did not wait until final judgment was entered on all parties' claims to file its post-judgment motions. Instead, each of Tierco's post-judgment motions were filed within ten days (as calculated according to the Rules and the calendar in this case) of the judgments they sought to change. The Court

---

**18.** This Court recently continued to construe the word "judgment" differently for rules related to post-judgment motions practice as opposed to those governing appealability. During a public hearing by the Court on the 134th Report of the Rules Committee, which occurred on 7 April 1997, the Court accepted a proposal to "save" premature appeals by amending Rule 8–602 to allow a notice of appeal filed after the announcement or signing of final judgment on all claims of all parties, but before entry of that final judgment, to be treated as filed on the same day as, but after, the judgment's entry on the docket. The Chairman of the Rules Committee suggested at that time that the Court might consider also amending the rules governing post-judgment motions in order similarly to "save" such motions that may be filed prematurely under similar circumstances. The Court elected not to do so, which action may be explained in part because we consistently have treated computation of timeliness of post-judgment motions different from those of appealability.

of Special Appeals should have concluded that the motions were timely and, therefore, Tierco's appeal was timely.

### III.

Although there were no formal allegations of racial discrimination asserted before trial, the trial in effect became one as much about the propriety of the actions of the ride attendants in supposedly allowing small white children to ride the Typhoon Sea Coaster on 31 July 1999 while preventing Shaniqua Smith from doing so as it was about alleged false imprisonment, assault, battery, or negligent supervision. Respondents sought at trial to cast as an act of racial discrimination at least the conduct of Six Flags and its employees in not extending to an African American family the same benefits allegedly extended to white patrons. How this effort also spilled over into all aspects of this case is of concern, notwithstanding Plaintiffs'/Respondents' disclaimers, at times, that they were not advancing racial discrimination in support of their claims. Where the focus of the Plaintiffs' case at trial should have been on establishing Six Flags' allegedly unreasonable use of force in restraining Respondents and then forcibly removing them to the security office where they were detained, much of the testimony instead centered on the events that occurred before they left the boat on the ride. The mistreatment of individuals on the basis of race, if that is what occurred, is deplorable and, if properly pled, actionable, but it cannot be the focus of a trial where it is not relevant to proof of any element of the theories of recovery pled by Plaintiffs/Respondents.

Respondents made the following pertinent allegations in the complaint:

### FACTS COMMON TO ALL COUNTS

* * *

6. That during the day, the Plaintiffs waited to go on a ride provided and maintained by the Defendant.

7. That, although payment had been made in full for the minor child, Shaniqua Smith, she was denied access to the ride known as the "Typhoon Sea Coaster[."] That although other children of the same height were allowed on the ride, Shaniqua Smith was advised that she was too short and would not be allowed to ride.

8. As other children had been allowed on, the Plaintiff Shaniqua Smith took a seat and the operator refused to allow the ride to continue.

9. As Shaniqua had paid to ride on the ride, the Plaintiffs advised that if the park would refund the money for Shaniqua, they would exit the ride.

10. That although management personnel of the Defendant arrived on the scene, no offer was made to refund the money for the ride.

\* \* \*

## COUNT ELEVEN

### BREACH OF CONTRACT

74. That the Plaintiffs repeat and reallege all averments of fact and negligence alleged in Counts One through Ten above as if restated at length herein.

75. That the Plaintiffs had an agreement in which all the Plaintiffs paid money as consideration for entering and enjoying the facility of the Defendant.

76. That the Defendants prohibited the completion of a ride and removed the Plaintiffs from the park, thereby preventing them the unfettered use of the facilities promised by the Defendant.

77. That the Plaintiffs made demand upon the Defendants for the return of their admission and to date no refund has been made.

Wherefore the Plaintiffs demand Judgment against the Defendant directly, its agents servants and employees in the amount of Ten thousand Dollars, with interest and costs.

This is the only claim in the complaint directed toward the events that preceded the confrontation on the loading platform of the ride.[19] Each of the other counts upon which the Respondents sought relief referred to the events that occurred after Respondents left their boat. There is no allegation in the complaint of racial discrimination. In fact, there is no mention of race anywhere in the complaint.[20]

Respondents did not raise racial discrimination as one of their assertions at any time before trial. For example, Respondents' proffered statement of facts in a 7 March 2001 pre-trial memorandum failed to mention any allegation of discrimination.[21]

Despite not having been raised by Respondents in the complaint[22] or in their pre-trial pleadings and papers filed

---

**19.** Respondents consented to the dismissal of their claim for breach of contract at the close of the plaintiffs' case-in-chief on the second day of trial, 30 October 2001. The trial judge accordingly granted a motion for judgment in favor of the defense at that time. The judgment was duly noted on the trial "daily sheet" included in the Circuit Court's case file. It was also noted on the docket at item number 66.

**20.** A complaint must "contain a clear statement of the facts necessary to constitute a cause of action." Md. Rule 2–305. The paramount purpose of this requirement is to give defendants notice of the claims against them. *See Scott v. Jenkins*, 345 Md. 21, 27–29, 690 A.2d 1000, 1003 (1997). At the core of the Constitutional due process rights embodied in the Fourteenth Amendment of the U.S. Constitution and Article 24 of the Maryland Declaration of Rights is "the right to notice and a meaningful opportunity to be heard." *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 508–09, 709 A.2d 142, 146–47 (1998).

**21.** The only mention of race we could find in any paper or pleading filed before the first day of trial is found in Tierco's 22 June 2001 response to a motion by plaintiffs to extend the discovery deadline. In that document, Tierco noted, in passing, that "Plaintiffs refused to exit the ride until Shaniqua was allowed to ride, because they claimed the staff's decision not to let Shaniqua ride was racially motivated." Presumably, this averment was based on deposition testimony or other facts uncovered during discovery, but not made a part of the court record.

**22.** To the extent that Maryland recognizes, or might recognize, a common law, private civil cause of action for damages arising from acts of racial discrimination, based on public policy declared in Maryland

with the Circuit Court, race was injected as an issue from the beginning of the trial. In his opening argument, Respondents' attorney asserted:

What concerns my clients today is that the reason that they sat on the boat for a few minutes longer than the security guards may have liked was, because they had questioned the fact that Shaniqua was one of the only children singled out, and they had seen younger, smaller, whiter children get on the boat. Smaller, whiter children get on the boat, and had not been stopped.

This statement set the tone for a significant amount of the testimony that followed.

Based on our careful, but unscientific, review of the record, race, a particular race, or discrimination were mentioned at least sixty-three times during the three day trial. Respondents' counsel or witnesses referred to race twenty-five times in direct examination during the Respondents'/Plaintiffs' case-in-chief (eight times in questions asked by Respondents' counsel and seventeen times volunteered by Respondents or their non-party witnesses). Tierco's attorneys, defending against this tact, asked Respondents' witnesses (including Respondents themselves) thirteen cross-examination questions relating to race.

A typical testimonial example came during the direct examination of D'Angelo Allen, an eyewitness called by Respondents. Having established that his current line of questions referred to Respondents, Respondents' attorney asked "Do

---

Code, Art. 49B, § 5 ("Discrimination In Public Accommodations— Prohibited; civil penalties.") or under any relevant Prince George's County ordinances under § 42 ("Civil actions for discriminatory acts— Montgomery County, Prince George's County, and Howard County"), Respondents did not plead such a claim. The viability of pleading such a claim may find some support by analogy in *Molesworth v. Brandon,* 341 Md. 621, 637, 672 A.2d 608, 616 (1996), where the Court held, in a wrongful discharge employment case, that Art. 49B, § 14 provided "a clear statement of public policy sufficient to support a common law cause of action for wrongful discharge" where the total number of the employer's employees fell below the minimum threshold necessary to invoke the remedies provided in the statutory scheme.

you recall seeing the child, the African–American child who was with that family? Do you recall seeing where she was when this altercation was occurring with the security officers?" The reference in the question to Shaniqua's race was, in context, purely gratuitous. There was no other family, let alone child, involved in the events. A few questions later, Respondents' attorney asked Mr. Allen, without making any reference to Shaniqua's race, "Do you recall seeing the young child at this point?" This suggests that Respondents' counsel mentioned Shaniqua's race earlier not to assist the witness in identifying the individual about whom the question inquired, but to reinforce to the jury that the events about which Mr. Allen was testifying involved an African American family, a fact that perhaps was, or would become, obvious to the jury in any event.

There were fewer references to race during the defense's case-in-chief. Attorneys asked of the witnesses called by Tierco only four questions relating to the race (one on direct by Tierco's counsel and three cross-examination questions by counsel for Respondents), but the witnesses volunteered answers with reference to race fourteen times. A large number of these volunteered answers related to things that the witnesses, mostly employees of Six Flags at the time of the incident, claimed to have heard on the scene. A typical example was the testimony of Joe Dudley, the ride attendant who first asked Respondents to leave the Typhoon Sea Coaster boat. In response to general questions that did not solicit expressly racial content, he explained that Respondents told him they had seen white children smaller than Shaniqua board the ride without challenge, and that he later observed that no such children were present on the ride when it was finally restarted following the confrontation.[23]

---

23. Which, of course, does not negate the possibility that the smaller white child or children, claimed to have been seen by Respondents, rode the ride at an early time during Respondents' hour long wait in the queue for the ride.

The picture that emerges is that some Respondents, Respondents' counsel, and several of Respondents' non-party witnesses apparently intended to convey to the jury an explicit racial animus element attributed to at least certain of Petitioner's alleged employees.[24] Petitioner, apparently unwilling to

---

**24.** At various points during cross-examination of several of the Respondents, Petitioner's trial counsel questioned whether they believed the amusement park's employees' various actions were motivated by racial discrimination.

The answers varied. Charles Smith, when asked whether the security guards involved in the fracas acted out of racial motivation or discrimination, responded, "No, they was not." The following colloquy occurred during the cross-examination of Frances Williams:

Q [by Petitioner's/defendant's counsel]: And, Ms. Williams, you are not here contending that what happened to you was a form of racial discrimination, are you?
[Respondents'/plaintiffs' counsel]: Objection.
The Court: Why don't you approach the bench. (Whereupon Counsel approached the bench, and the following ensued).
The Court: What is the basis of your objection?
[Respondents'/plaintiffs' counsel]: He's asking the ultimate fact conclusion of the fact finder, whether she contends it's not or it is.
The Court: It's not part of the suit, is it?
[Respondents'/plaintiffs' counsel]: It's actually not part of the suit.
The Court: So what would the fact finder have to do with it?
[Respondents'/plaintiffs' counsel]: I guess you're right, Your Honor.
[Petitioner's/defendant's counsel]: He put it into the case. I'm going to bury it.
THE COURT: I'm going to overrule the objection.
(Whereupon Counsel returned to their trial tables, and the following ensued.)
Q. Ms. Williams, I believe the question that I asked you was, you were not contending, as part of this case, that what happened to you was a result of some form of racial discrimination, are you?
A. I don't believe it was initiated as racial discrim—It was a bad judgment, I think; not necessarily racial or anything. Just so happened that the other kids were white, but I don't believe so, no.
When Linda Williams was asked a similar question ("It's also true, is it not ... that you are not able to say if—how you were treated by the attendant—there was an issue of racial discrimination?"), she responded, "Whether they discriminated or not, I don't know, but all I know is that there was a white family who was allowed to ride who whether you could classify it as discrimination, I don't know. Personally, I don't think that was the issue, but I think it was just misjudgment." Katrina Smith, asked whether she believed that the security guards' actions were racially motivated, responded, "What the security guards did to me, what their motivation was, I do not know."

object or to ignore the specter of race introduced into the trial, attempted to defend against such assertions. Thus, as presented to the jury, the case was as much about alleged race discrimination as it was about false imprisonment, assault, battery, or negligent supervision. Even the trial judge commented regarding her observations of the jury's strong reactions to the testimony about race.

Mr. Allen, Respondents' eye witness mentioned *supra*, testified that he and his wife voluntarily submitted reports of the events they observed to the Six Flags security office on the night of the incident, 31 July 1999. During the hearing on Tierco's post-judgment motions, the trial judge commented about later testimony by a Six Flags employee regarding the Allens' reports:

"I know there was some comments made as to the reactions of the jury. You know, as the judge I do sit and I watch the jury. And there were some very, very strong reactions throughout several portions of the testimony.

"I don't recall the gentleman's name, but there was an official from Six Flags who came and testified. And you could see the jury visibly react to part of his testimony.

"One of the questions that were asked: Well, did you review the statements of—there were two independent witnesses who testified, and they testified for the Plaintiff and against Six Flags. And they had no connection with the Plaintiffs.

"And this gentleman was asked: Did you review the statements?

"No. That was his answer: No.

---

Given Respondents' counsels' arguments and the testimony less equivocally injecting racial considerations into the case, we view the above disclaimers, to the extend they may be construed as disclaimers, to be in the nature of an effort to "have one's cake and eat it too." (*See A Dictionary of American Proverbs* 79 (Wolfgang Meiden, et al., ed., 1992), where this old saw is attributed to John Heywood's *Proverbs* (1546) ("Would ye both eat your cake and have your cake?")).

"Well, the next question was: Would it have made any difference to you, or would you have done anything differently?

"And his answer was: No.

"Like these statements were totally negligible. And you could see the jury react very, very strongly at that point."

Respondents' attorney may have observed the same strong reactions from the jury because he alluded to these statements in his closing argument. Mr. Allen wrote in his 31 July 1999 statement to Six Flags that "I deeply recommend sensitivity training of your attendants dealing with all races who frequent your park." Respondent's counsel harkened back to this during closing argument:

Thank God for people like Mr. Allen; able to come forward and say, "There is a need for sensitivity training." We didn't make our argument about sensitivity training. Why is that wrong? Why is it not a part of the trial?

In context, "sensitivity training" appears to be a euphemism alluding to a perceived remedy for the racial discrimination insinuations advanced by Respondents and their witnesses at various times during trial.

The resulting verdicts, a combined $1,000,000 in compensatory damages and $1,500,000 in punitive damages, seem out of proportion (excessive) in a case where the Respondents/Plaintiffs offered no evidence of major or permanent physical or mental injuries and where their confinement, if wrongful, was for about an hour. Respondents, with the exception of Shaniqua, were each handcuffed for about an hour and were forced to walk through the park in plain view of other patrons. They each complained of immediate, but short-term, emotional distress caused by their treatment.

Charles Smith complained of a cut elbow, chest contusions and a sore upper body. At trial, he complained that his chest was "a little sore every once in a while," but that otherwise he had healed. He did not submit medical bills or claim any lost wages. He was awarded $250,000 in compensatory damages. His wife, Katrina Smith, complained of temporarily swollen

wrists and sore shoulders from the handcuffs. The jury awarded her $200,000 in compensatory damages. Charles Smith testified that Shaniqua Smith cried and was upset by the incident and had nightmares for two or three nights afterwards. He also testified that, for about a week after the incident, she asked if uniformed police officers were the ones who held him on the ground. Shaniqua's battery claim was dismissed, and she alleged no physical injuries. The jury awarded Shaniqua Smith $200,000. Linda Williams, Shaniqua's grandmother, suffered from sore arms and shoulders from the handcuffs and shortness of breath from the relatively quick walk to the security station. Her glasses were damaged, but she did not submit a bill for the glasses or for any medical treatment. She also lost two days' work as a nurse, which she valued at $330.24. The jury awarded her $200,000 as compensation. Frances Williams did not allege any physical injuries. She was awarded $100,000 in compensatory damages.[25]

We conclude that there exists a significant probability that the jury's verdicts in the present case were influenced by Respondents' irrelevant and improper injection of racial considerations into the trial.[26] Such statements, "if irrelevant and unjustified and calculated or tending to arouse racial, national, or religious prejudice or feeling, [are] universally condemned." *See* C.R. McCorkle, Annotation, *Statement By Counsel Relating To Race, Nationality, Or Religion In Civil Action As Prejudicial,* 99 A.L.R.2d 1249, 1254 (1965). The key question

---

25. As noted earlier, Respondents collectively were awarded $1,500,000 in punitive damages by the jury, which award was vacated by the trial judge on the basis of a lack of evidence regarding actual malice.

26. On some occasions, we imagine race covertly may affect the outcome of trials where it is not relevant to the cause(s) of action pled or the relief sought. There is ordinarily little appellate courts can do to rectify directly such inchoate improprieties because the appellate record will be devoid of the mention of race and, accordingly, no ability to link race as an improper causative influence on the verdict. In the present case, however, because race was made a conspicuous factor in the proceedings, as recognized on the record and even by the trial judge, we are able to identify and correct the error directly.

in determining whether such statements are improper is whether the statements are relevant to the causes of action pled or the relief sought in the case. For example, in *Haryanto v. Saeed*, 860 S.W.2d 913, 920 (Tex.App.1993), one of the reasons why an Indonesian national allegedly attacked a Pakistani refugee was their respective nationalities and attendant historical regional animosities. That court found that the factual story could not be presented reasonably to the jury without reference to ethnicity or nationality. *See also Mindt v. Shavers*, 214 Neb. 786, 337 N.W.2d 97, 102 (1983) (The description of the defendant as a "large black male" in opening arguments was relevant to the trial and therefore not improper because identification was an issue in the case).

On the other hand, where the purpose of the reference to race, nationality, or religion is to inflame the passions of the jury, the reference is improper and prejudicial. In *Liggett Group Inc. v. Engle*, 853 So.2d 434 (Fla.App.2003), *cert. granted, Engle v. Liggett Group*, No. SC03–1856, —— So.2d —— (Fla. 12 May 2004) (order accepting jurisdiction and setting schedule for oral arguments) (at the time the present case was published, the Florida Supreme Court had granted *certiorari*, but no order to that effect had yet appeared in the Southern Reporter), an attorney's improper race-based arguments caused irreparable prejudice that required a reversal of the jury's verdict. There, the court found that the attorney had inflamed the jury with racial pandering by juxtaposing the defendant's conduct with genocide, the Holocaust, and slavery. *Id.* at 459. In *Texas Employers' Ins. Ass'n v. Guerrero*, 800 S.W.2d 859, 862 (Tex.App.1990), an attorney improperly suggested that the primarily Hispanic jury ought to "stick together as a community" and support the Hispanic plaintiff. "When a racial or ethnic appeal is made, the dispute is no longer confined to the litigants; there has been an attack on the social glue that helps bind society together.... Lawyers have no right to undermine the ethnic harmony of society simply to win a lawsuit." *Id.* at 865. The case was reversed and remanded for a new trial. *See also F.J.W. Enterprises, Inc. v. Johnson*, 746 So.2d 1145, 1146–47 (Fla.App.1999)

(where defense counsel legitimately had requested a race-based question in voir dire, plaintiff's counsel in opening arguments improperly prejudiced the jury by claiming that the defense had played "the race card"); *LeBlanc v. American Honda Motor Co., Inc.*, 141 N.H. 579, 688 A.2d 556, 560–61 (1997) (remarks calculated to encourage the jury to make a decision based on anti-Japanese bias were so prejudicial as to require a new trial).[27]

While some reference to race was necessary to explain to the jury why Respondents refused to leave the Typhoon Sea Coaster boat and thereby to set the scene for testimony regarding the alleged physical over-reaction of the Six Flags employees, Respondents employed race overtly to overwhelm the material issues of provocation and of the reasonableness *vel non* of the actions of the Six Flags employees. It is apparent to us from our review of the record that the focus of the trial shifted to the propriety of the decision not to let Shaniqua enjoy the ride.

It is clear that Six Flags had an objective basis to prevent Shaniqua from riding the ride.[28] At one point during trial,

---

**27.** Some courts have held that an improper appeal to race, nationality, or religion is *per se* grounds for a mistrial. *See, e.g., Guerrero*, 800 S.W.2d at 866 ("We hold that incurable reversible error occurs *whenever* any attorney suggests, either openly or with subtlety and finesse, that a jury feel solidarity with or animus toward a litigant or a witness because of race or ethnicity.") (emphasis added). *But see Haryanto*, 860 S.W.2d at 920 ("In support of his position, appellant cites cases which hold that argument appealing to race, ethnicity or nationality is incurable[, including *Guerrero* ]. However, in those cases the issues of race, ethnicity or nationality were injected into the case solely by counsel's argument.") (citations omitted); *LeBlanc*, 688 A.2d at 560 ("Although we have considered seriously the adoption of a per se rule of reversal in such cases, we believe it better at this time to leave these matters to the sound discretion of the trial court.").

**28.** The Typhoon Sea Coaster's manufacturer set 46 inches as the minimum safe height for the ride. "When a manufacturer or the Commissioner [of Labor and Industry] requires a restriction on the use of a ride, such as the age, height, or weight of a rider, a legible sign indicating the restriction shall be posted in close proximity to the amusement ride or attraction, in full view of individuals seeking admission to the ride." COMAR 09.12.62.11(F)(2). "An amusement ride or

Respondents' counsel made it clear that Respondents did not dispute the decision of the Six Flags employees to keep her from riding. Indeed, an argument to the contrary would have been nonsensical because Shaniqua would have been put in danger of injury had the Six Flags employees allowed her to ride.

The rule that attorneys may not employ irrelevant arguments based on race, nationality, or religion in order to inflame the passions of the jury first manifested in cases involving arguments that appealed to the racial prejudices of jurors. *See* C.R. McCorkle, Annotation, *Statement By Counsel Relating To Race, Nationality, Or Religion In Civil Action As Prejudicial*, 99 A.L.R.2d 1249, 1254 (1965). Particularly during the period of time when non-whites were barred from serving on juries, arguments that prejudiced a jury against a particular party or witness based solely on that person's race, nationality or religion were the primary concern. *See, e.g., Contee v. State*, 223 Md. 575, 165 A.2d 889 (1960) (in the trial of an African American man accused of raping a white woman, the prosecutor improperly stressed the race of the alleged victim vis à vis that of the defendant: "How many other white girls do you have intercourse with?"). Since then, courts across the country have applied the same analysis to cases in which jurors who belong to racial minorities were asked to come to particular conclusions for the sake of "unity" with their ethnic or racial communities. *See, e.g., Guerrero*, 800 S.W.2d at 862. They also have applied the same analysis when a party is accused improperly of racial discrimination, as Tierco, through its reputed employees, was

---

attraction shall be operated in accordance with [t]he manufacturer's specifications." COMAR 09.12.62.07(A). *See also* COMAR 09.12.62.03(A) ("Each owner or operator of an amusement ride or attraction permanently or temporarily erected at a carnival, fair, or amusement park in the State shall ... [e]nsure that the manufacturer's specifications are followed in the design, construction, erection, *operation*, maintenance, repair, and disassembly of a ride or attraction.") (emphasis added). Respondents did not adduce evidence that Shaniqua was taller than 46 inches or that it would have been safe for her to experience the ride.

in this case. *See Engle,* 853 So.2d at 458–64; *General Motors Acceptance Corp. v. Baymon,* 732 So.2d 262, 271–72 (Miss. 1999) (attorney improperly raised allegations of racial discrimination in a breach of contract and fraud action).

Tierco argues that the trial judge ought to have granted fully its request for a new trial embedded in its post-judgment motions. A new trial may be required when prejudicial statements or arguments reach the jury.

> The question whether to grant a new trial is within the discretion of the trial court. Ordinarily, a trial court's order denying a motion for a new trial will be reviewed on appeal if it is claimed that the trial court abused its discretion. However, an appellate court does not generally disturb the exercise of a trial court's discretion in denying a motion for a new trial.

*Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 57, 612 A.2d 1294, 1297 (1992) (quoting *Mack v. State,* 300 Md. 583, 600, 479 A.2d 1344, 1352 (1984)). Despite this high standard, cases occasionally arise in which a trial court's denial of a motion for mistrial constitutes an abuse of discretion. *Lai v. Sagle,* 373 Md. 306, 313–14, 818 A.2d 237, 242 (2003).

> [I]mproper or prejudicial statements, remarks or arguments of counsel generally are cured by reproof by the trial judge; to [her] discretion customarily is left the choice of methods to protect the fair and unprejudiced workings of the judicial proceedings and [her] decision as to the effect of that choice upon the jury and only in the exceptional case, the blatant case, will [her] choice of cure and [her] decision as to its effect be reversed on appeal.

*DeMay v. Carper,* 247 Md. 535, 540, 233 A.2d 765, 768 (1967). *See also Wilhelm v. State,* 272 Md. 404, 416, 326 A.2d 707, 716 (1974) (when a prosecutor makes an improper statement during opening statement, "[t]he applicable test for prejudice is whether we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error"); *Nelson v. Seiler,* 154 Md. 63, 72, 139 A. 564, 567

(1927) ("In the greater number of instances the injection into a trial of matter other than that involved in the issue to be decided is cured by withdrawal of it and an instruction to the jury to disregard it, but there may, of course, be instances in which it would not be cured in this way and terminating the trial and taking the case up afresh before another jury would be the only adequate means of correction. Those instances are exceptional, but they do arise."). The ultimate question is whether the prejudice was so great that it denied Tierco a fair trial. *See Med. Mut. Liab. Ins. Soc'y of Maryland v. Evans,* 330 Md. 1, 19, 622 A.2d 103, 112 (1993).

 In light of the number of references to race in the record of this trial, the trial judge's observations of the very strong reactions of the jury to racially-tinged testimony, and the potential harm to the Maryland judicial system if this type of overt tactic were to be permitted to prevail, we conclude that the trial judge abused her discretion by failing to grant Tierco's request for a new trial.[29]

---

**29.** We remind Tierco of the venerable admonition, "be careful what you wish for." As we are remanding for a new trial, evidence of racial animus, if properly linked to the causes of action pled, may be relevant to establish actual malice for the purposes of the punitive damages claim.

Respondents/Plaintiffs alleged malice with respect to the Six Flags employees' conduct under the assault, battery, and false imprisonment counts. "[A]n award of punitive damages must be based upon actual malice, in the sense of evil or wrongful motive, intent to injure, ill will, or fraud." *Bowden v. Caldor,* 350 Md. 4, 23, 710 A.2d 267, 276 (1998) (*Bowden II* ). We previously suggested that racial animus may be a potential basis for a finding of actual malice. *See Bowden II,* 350 Md. at 42, 710 A.2d at 285 ("the juries likely and reasonably concluded that the Caldor officials involved in this matter were motivated by racial hatred"). On the record of the present case, however, the discriminatory conduct that Respondents alluded to at trial—that Six Flags allegedly allowed as short or shorter white children to ride while prohibiting Shaniqua Smith from doing so—was not relevant to the causes of action that formed the bases of the damage claims.

In *Bowden II,* we made clear that a general claim of actual malice is not sufficient to justify punitive damages. There must be a connection between the form of actual malice that is alleged by the party seeking punitive damages and the elements of the tort or torts that form the basis of that claim.

[N]ot all of the forms of "actual malice" are pertinent to every type of tort action. For example, in a defamation action, punitive damages are not recoverable based upon ill will, spite, or an intent to injure; instead, to recover punitive damages, the plaintiff must establish that the defamatory falsehood was made with actual knowledge that it was false. Similarly, in an action of deceit, punitive damages are allowable only where it is proven that the defendant "knows that his representation is false;" a recovery in deceit based upon the defendant's "reckless disregard" or 'reckless indifference' concerning the truth of the representation falls short of the mens rea which is required to support an award of punitive damages." In a malicious prosecution action, the form of "actual malice" which must be established for the recovery of punitive damages "consists of an improper or wrongful motive in causing the initiation of criminal proceedings against the plaintiff." For punitive damages to be recoverable in a products liability action, the "plaintiff must show that the defendant actually knew of the defect and of the danger of the product at the time the product left the defendant's possession or control," and "the plaintiff is required to show that, armed with this actual knowledge, the defendant consciously or deliberately disregarded the potential harm to consumers."

350 Md. at 23–24, 710 A.2d at 276–77.

Like the present case, *Bowden I and II* involved a claim of false imprisonment. Bowden, an African–American then sixteen years of age, took a part-time job at Caldor, a regional retail department store. On 15 June 1988, he was invited into a windowless room where he was restrained and interrogated for several hours regarding alleged thefts he perpetrated—accusations that were determined later to be baseless. He was allowed to leave only after he wrote and signed a statement, later repudiated, stating that he was responsible for the thefts. Bowden returned with his mother, when he was again restrained, and ultimately was led, in handcuffs, through the store. He remained there in full view of customers and fellow employees until Baltimore County police officers arrived and arrested him. 350 Md. at 12–13, 710 A.2d at 271.

After a juvenile court dismissed all charges against him, Bowden commenced in the Circuit Court for Baltimore City a civil action against Caldor and several of its security personnel. He alleged five counts against the defendants: false imprisonment, malicious prosecution, defamation, wrongful discharge, and intentional infliction of emotional distress. The jury found for him on all counts and awarded Bowden compensatory and punitive damages. The trial judge subsequently granted JNOV in favor of the defense on the wrongful discharge and intentional infliction of emotional distress counts. 350 Md. at 13–14, 710 A.2d at 271. Because it was not clear which claims formed the basis for the jury's punitive damages award, this Court ordered that the case be returned to the trial court for a new trial on punitive damages only. *Caldor v. Bowden*, 330 Md. 632, 625 A.2d 959 (1993) (*Bowden I* ).

At the culmination of the second trial, the jury granted Bowden a combined $9,000,000 in punitive damages based on the three remaining claims. *Bowden II*, 350 Md. at 15, 710 A.2d at 272. In *Bowden II*, this Court held that the trial court was correct in granting Caldor's

 We come to this conclusion even though Tierco does not appear to have objected to Respondents' race-based arguments and "evidence" during trial. "[O]rdinarily a party will not be permitted to raise on appeal an error to which he has not interposed a seasonable objection at trial." *Buck*, 328 Md. at 61, 612 A.2d at 1299. Only in rare and extreme cases should we elect to address on appeal an issue that was not preserved properly at trial.[30] Improper and irrelevant race-

---

motion for remittitur because the punitive damages award was excessive, but that the trial court reasoning behind its ultimate grant of $350,000 as the appropriate punitive damages award was faulty. We returned the case to the trial court for a new determination of the proper punitive damages award. 350 Md. at 42, 710 A.2d at 286.

Of greatest potential significance to the present case on remand, this Court in *Bowden II* agreed that "racial hatred," evidenced by one defendant's statement "You people—you nigger boys make me sick, but you're going to burn for this, you sucker," was a relevant factor to consider in determining whether actual malice existed. 350 Md. at 42, 710 A.2d at 285.

On the record of the present case, the refusal to allow Shaniqua to ride the ride, if it was based on racial discrimination, was not pled or argued as racial animus linked to the altercation after Respondents left the loading station. It was the actions of the security guards and other employees of the amusement park that, according to Respondents, struck them, handcuffed them, "paraded them" through the park, and then held them in the security office for an hour, that was at issue in Respondents' claims of malicious assault, battery, and false imprisonment. It is those actors who must be scrutinized for actual malice. Respondents did not allege—and, in the instance of Charles Smith, explicitly denied—that those particular employees were motivated by racial animus. The question of whether the ride attendants who refused to allow Shaniqua to ride did so based on a discriminatory motive, on this record, was irrelevant to the motivation of the security guards and others who allegedly committed assault, battery, and false imprisonment.

For purposes of a new trial, evidence of racial animus nonetheless may be relevant to the punitive damages claims if Respondents are able to link it causally to the pled causes of action. If such an effort is mounted, the trial court, in its discretion, may consider bifurcation of the trial between liability and punitive damages as a means to limit or ameliorate the potential for contamination of the former by any evidence of racial animus found relevant as to the latter. *See generally Darcars v. Borzym*, 379 Md. 249, 273–74, 841 A.2d 828, 842–43 (2004), and cases discussed there.

30. Tierco, in its amended "post-trial" motion at 17, included a brief paragraph, buried in its argument seeking a new trial or remittitur as to

based evidence and arguments that serve only to inflame the jury present such an extreme and rare case. Accordingly, we follow here the lead of other jurisdictions that have not required such an objection during trial. *See Engle,* 853 So.2d at 462 ("An appeal to race so fundamentally damages the fairness of a trial, that even in the absence of an objection, a new trial is required in order to maintain the public trust in our system of justice."); *Guerrero,* 800 S.W.2d at 863 ("an appeal to racial prejudice—as opposed to the mere incidental mention of race—constitutes reversible error even if no objection was made").

## IV.

Because we remand this case for a new trial, we need not, and do not, decide the issue of whether Tierco properly was held liable for the actions attributed to Six Flags and its employees. After reviewing this record, however, we choose to sound a cautionary note before returning the case to the Circuit Court for a new trial.

At trial, Tierco's name was rarely mentioned before the jury. The case caption on the verdict sheet was *"Eddie Williams, et al. v. Six Flags Operations, et. al."* The verdict sheet presented such special verdict questions as "Did Six Flags employees commit an assault against Shaniqua Smith?" and "Did Six Flags' negligence cause or contribute to injuries sustained by Shaniqua Smith?" As far as the jury knew, the defendant in the case was an entity known as "Six Flags." When the judgments based on those verdicts were entered, however, nearly four months after the conclusion of the trial, they were "against the Defendant, Tierco Maryland, Inc. d/b/a Six Flags America." Tierco disputes its responsibility for the

---

punitive damages, complaining that Respondents'/Plaintiffs' trial counsel "inappropriately injected evidence on issues prejudicial to the defense," to wit, "made this a 'race' case." This, however, was the only explicit mention in the trial court of a complaint on this ground.

actions of Six Flags or Six Flags's employees, but had no real opportunity to do so before the jury.[31]

Like any defendant, Tierco is entitled to have all of the facts related to its civil liability decided by a jury. Md. Const. Declaration of Rights art. 23 ("The right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of $10,000, shall be inviolably preserved."). "[T]he question whether an employer-employee relationship exists is one for the jury to determine." *Mackall v. Zayre Corp.*, 293 Md. 221, 230, 443 A.2d 98, 103 (1982).

Respondents' original complaint, filed on 21 July 2000, named, as defendants, "Premier Parks, Incorporated D/B/A Six Flags America, which is a subsidiary of Tierco Maryland, Inc., which is a subdivision of Tierco Inc. Group." A summons was issued to Premier Parks, Inc. On 4 August 2000, Respondents filed an Amendment to Correct Misnomer seeking to "amend the Defendant's name in the caption from 'Premier Parks, Inc.' to the corrected name of 'Six Flags Operations.'" A summons was issued to Six Flags Operations. An entity that identified itself as Six Flags Operations, Inc., filed an Answer to Respondents' complaint. That Answer stated, as affirmative defenses, "[t]he plaintiffs have failed to name the proper party in this case. Six Flags Operations, Inc., does not, and did not, own or operate the amusement park where the alleged incident occurred" and "[t]here exists no legal entity known as Six Flags Operations, Inc."

Respondents filed, on 15 September 2000, a "Motion to Correct Misnomer" which appears to have been treated by the court as a motion to amend the complaint. Pursuant to that motion, a judge issued the following order on 16 October 2000:

---

31. This is the latest in a series of cases where the identity of a corporate entity doing business under the Six Flags name has been at issue. *See, e.g., Meteoro Amusement Corp. v. Six Flags*, 267 F.Supp.2d 263, 269 (2003) (The issue of which entity owns and operates the sixflags.com website is a contentious one."); *Rice v. Six Flags Over Georgia, LLC*, 257 Ga.App. 864, 572 S.E.2d 322 (2002).

[T]he following names of the Defendant, shall be and are hereby included in this matter: Six Flags Operations, Inc. or alternatively, Premier Parks, Inc. or alternatively, Premier Parks Operations, Inc. or alternatively, Tierco Maryland, Inc. or alternatively, Tierco Inc. Group or alternatively, Six Flags Operations or alternatively, Six Flags America or alternatively, Six Flags Theme Parks, Inc. or the appropriate name of the entity owning an/or operating the amusement facility know as Six Flags America located at Largo and/or Mitchellville, Maryland.

Summonses were issued to Six Flags Operations, Inc.; Premier Parks Operations, Inc.; Tierco Maryland, Inc.; Tierco Inc. Group; Six Flags America; Six Flags Theme Parks, Inc.; and Premier Parks, Inc. A single, joint Answer was filed in which each of the entities that received a summons denied responsibility for the operation of the amusement park. The Answer also included, as an affirmative defense, "[t]here exist no legal entities known as Six Flags Operations, Tierco Inc. Group, Six Flags Theme Parks, Inc., Six Flags America or Premier Parks Operations, Inc."

The judge who presided over the trial allowed the earlier judge's order to stand throughout the trial. At the trial's culmination, the jury returned a verdict against "Six Flags."

Following the trial, Respondents filed an Application for Judgment, asking the trial court to issue a judgment "against the Defendant, Tierco Maryland, Inc., d/b/a/ Six Flags America." In its application for judgment, Respondents pointed out that the "trespass letters" issued to Respondents identified Tierco as the corporate name for Six Flags America. The "trespass" letter issued to Charles Smith reads:

"This letter will serve as official notification that you are hereby restricted from Tierco Maryland, Inc., d/b/a Six Flags America property for a period of [the word "Life" is hand-written here] in accordance with Article 27, Section 577 of the Annotated Code of Maryland [32] from receipt of this letter.

---

32. The trespass provisions formerly located at Maryland Code (1957), Art. 27 § 577 can now be found at Title 6, Subtitle 4 of the Criminal Law Article.

"The Six Flags Theme Park is a private property. Article 27, Section 577 of the Annotated Code of Maryland states that a person is guilty of a misdemeanor for trespassing upon private property after having been duly notified by the owner or agent not to do so.

"If you are found on any portion of Tierco Maryland, Inc./Six Flags property you will be arrested for trespassing."

The letters issued to other Respondents were substantially similar. Tierco countered that it was referenced in these letters merely as the owner of the property and that it was not responsible for the actions of the Six Flags employees. Tierco's opposition boiled down to two contentions. The first was that Respondents did not establish Tierco's agency liability for Six Flags or its employees. According to Tierco, the jury found that the hypothetical entity referred to at trial as "Six Flags" was responsible for the actions of the security guards and others who committed the alleged torts, but not that Tierco was responsible for the actions of those individuals or for the actions of Six Flags. The second contention was that Respondents did not establish premises liability for Tierco as a property owner.

We express no opinion regarding what the jury explicitly or implicitly found in its verdict with regard to the question of Tierco's liability. Our disposition of this case renders the point moot for present purposes. We note only that Tierco is entitled to have the facts related to civil allegations against it presented to and decided by a jury, when a jury trial is elected. *See* Md. Const. Declaration of Rights art. 23. While it is not necessary that Tierco's name appear on the verdict sheet for Tierco to be held liable in a future trial, it may be advisable for the name of the ultimate defendant or defendants to appear on the jury verdict sheet so that, for possible further appellate review, no doubt lingers about who the jury regards as liable, if anyone.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND REMAND TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.*

### APPENDIX

#### RELEVANT PROCEDURAL TIME LINE

| | |
|---|---|
| 29 October 2001 | — Oral voluntary dismissal, on first day of trial and in open court, of claims of Eddie Williams, a plaintiff; trial judge and defendants consent orally |
| 31 October 2001 | — Jury verdict returned in favor of plaintiffs/Respondents for compensatory and punitive damages |
| 21 February 2002 | — Written judgments on verdict, signed 15 February 2002, entered on docket |
| 25 February 2002 | — Tierco's original Rule 2–532(b) motion for judgment NOV, regarding written judgments on verdict, entered on docket |
| 4 March 2002 | — Tierco's amended Rule 2–532(b) motion for judgment NOV (the second motion) entered on docket |
| 7 March 2002 | — Written judgment memorializing voluntary dismissal of Eddie Williams's claims entered on docket |
| 31 May 2002 | — Trial court signs written order vacating punitive damages award, i.e. grants Tierco's motions in part |
| 5 June 2002 | — Order of 31 May 2002 vacating punitive damages awards entered on docket |
| 13 June 2002 | — Order signed by trial court denying plaintiffs'/Respondents' motion to strike Tierco's post-judgment motions |
| 14 June 2002 | — Tierco's appeal entered on docket |
| 20 June 2002 | — Order denying plaintiffs'/Respondents' motion to strike Tierco's post-judgment motions entered on docket |
| 28 June 2002 | — Plaintiff/Respondents' cross-appeal entered on docket |
| 2 July 2002 | — Tierco's Amended Appeal entered on docket |

*Dissenting Opinion by* BELL, Chief Judge.

Maryland Rule 8–131(a) provides:

"(a) Generally. The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

Although expressed in discretionary terms with respect to whether to decide non jurisdictional issues neither raised in, nor decided by the trial court, the rule recognizes possible exceptions when a decision is desirable, when it is "necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

This is so because, as this Court has stated often, the primary purpose of Rule 8–131(a) is " 'to ensure fairness for all parties in a case and to promote the orderly administration of law.' " *State v. Bell,* 334 Md. 178, 189, 638 A.2d 107, 113 (1994), (quoting *Brice v. State,* 254 Md. 655, 661, 255 A.2d 28, 31 (1969), quoting *Banks v. State,* 203 Md. 488, 495, 102 A.2d 267, 271 (1954)); *Basoff v. State,* 208 Md. 643, 650, 119 A.2d 917, 921 (1956). The latter interest, that of fairness, is furthered, we have said, "by 'requir[ing] counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings,' " *id.,* (quoting *Clayman v. Prince George's County,* 266 Md. 409, 416, 292 A.2d 689, 693 (1972)); *Braxton v. State,* 57 Md.App. 539, 549, 470 A.2d 1327, 1331–32, *cert. denied,* 300 Md. 88, 475 A.2d 1200 (1984), and that an appellate court's discretion to affirm a decision on a ground not raised below "should be exercised only when it is clear that it will not work an unfair prejudice to the parties or to the court." *Id.* (footnote and some citations omitted).

Thus, pursuant to this rule, "when a party has the option of objecting, his failure to do so while it is still within the power of the trial court to correct the error is regarded as a waiver, estopping him from obtaining a review of the point or question on appeal." *Lohss v. State,* 272 Md. 113, 119, 321 A.2d 534, 538 (1974) (quoting *Phil J. Corporation v. Markle,* 249 Md. 718, 725–726, 241 A.2d 718 (1968)); *Hamilton v. State,* 225 Md. 302, 309, 170 A.2d 192 (1961); *Basoff v. State,* 208 Md. 643, 650, 119 A.2d 917 (1956); *Banks v. State,* 203 Md. 488, 495, 102 A.2d 267 (1954). *See also Carrier v. Crestar Bank, N.A.,* 316 Md. 700, 725, 561 A.2d 227, 240 (1989) (noting that, while Maryland Rule 8–131 permits the Court to decide issues raised but not decided by the trial court, in many cases, that is not desirable without the issue having been examined and first resolved by the lower court); *K–Mart Corp. v. Salmon,* 76 Md.App. 568, 582, 547 A.2d 1069, 1076 (1988), *cert. denied* 314 Md. 496, 551 A.2d 867 (1989), *overruled on other grounds* by *Montgomery Ward v. Wilson,* 339 Md. 701, 723, 664 A.2d 916, 926 (1995) ("The rationale behind this Rule [8–131] is judicial economy—counsel must bring his or her client's position to the attention of the trial court so that it can pass upon and possibly avoid any errors in the proceeding.").

It is rare, therefore, that this Court has addressed, on direct appeal, issues to which the aggrieved party did not object in the trial court. When it has done so, it has generally been for the reasons identified in the Rule. And that has generally occurred when the judgment of the trial court is being reversed for other error.[1] Guidance of the trial court or the

---

1. *See Office of Governor v. Washington Post Co.,* 360 Md. 520, 532 n. 5, 759 A.2d 249, 256, n. 5 (2000). In that case, after noting that the use of the word, "[o]rdinarily," in the second sentence of Rule 8–131(a) gives an appellate court " 'independent discretion' to excuse the failure of a party to preserve an issue for appellate review," *id.,* (quoting *Moosavi v. State,* 355 Md. 651, 661, 736 A.2d 285, 290 (1999)), in turn, quoting *Squire v. State,* 280 Md. 132, 134–135, 368 A.2d 1019, 1020 (1977), and citing *Gindes v. Khan,* 346 Md. 143, 151, 695 A.2d 163, 167 (1997) ("Rule 8–131(a) is not absolute.... Under this rule the Court has discretion, which we have exercised on occasion, to consider an issue raised for the first time on appeal"), the Court observed "[m]oreover,

avoidance of the expense or delay of another appeal is neither necessary nor relevant, otherwise.

Related to, and thus complementary of, Rule 8–131(a) is Maryland Rule 2–517. As relevant, it provides:

"(a) *Objections to Evidence.* An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived. The grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs. The court shall rule upon the objection promptly. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court may admit the evidence subject to the introduction of additional evidence sufficient to support a finding of the fulfillment of the condition. The objection is waived unless, at some time before final argument in a jury trial or before the entry of judgment in a court trial, the objecting party moves to strike the evidence on the ground that the condition was not fulfilled.

\* \* \* \*

"(c) *Objections to Other Rulings or Orders.* For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs. If a party has no opportunity to object to a ruling or order at the time it is

---

we shall be remanding this case to the Circuit Court for further proceedings, and the issue of the applicability of the Act to the defendants is a threshold issue of law. Thus, it is the type of issue contemplated by the final clause of Rule 8–131(a). In sum, we shall exercise our discretion to consider the issue." *Id.* We have also exercised our discretion to review an unpreserved issue when it "is a novel and important one and calls for some guidance." *Burch v. State,* 346 Md. 253, 289, 696 A.2d 443, 461 (1997).

made, the absence of an objection at that time does not constitute a waiver of the objection." [2]

*See also* Maryland Rule 4–323(c) and 4–325(e), which, respectively, provide:

*"(c) Objections to Other Rulings or Orders.*—For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs. If a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection at that time does not constitute a waiver of the objection,"

and

*"(e) Objection.* No party may assign as error the giving or the failure to give an instruction unless the party objects on

---

**2.** The criminal law counterpart of the Rule is Maryland Rule 4–323:

*"(a) Objections to Evidence.* An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived. The grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs. The court shall rule upon the objection promptly. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court may admit the evidence subject to the introduction of additional evidence sufficient to support a finding of the fulfillment of the condition. The objection is waived unless, at some time before final argument in a jury trial or before the entry of judgment in a court trial, the objecting party moves to strike the evidence on the ground that the condition was not fulfilled.

\* \* \* \*

*"(c) Objections to Other Rulings or Orders.* For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs. If a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection at that time does not constitute a waiver of the objection."

the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object."

Maryland Evidence Rule 5–103(a) is also pertinent. It provides:

> *"(a) Effect of Erroneous Ruling.* Error may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling, and
>
> > "(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was requested by the court or required by rule; or
> >
> > "(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer on the record or was apparent from the context within which the evidence was offered. The court may direct the making of an offer in question and answer."

Trial courts and the role of the judge in their operation and proceedings are important and must also be considered with respect to the propriety of the result reached in this case. Trial judges have the widest discretion in the conduct of trials, and the exercise of that discretion should not be disturbed on appeal in the absence of clear abuse. *Brooks v. Daley,* 242 Md. 185, 196–97, 218 A.2d 184, 191 (1966); *Plank v. Summers,* 203 Md. 552, 554–55, 102 A.2d 262, 263 (1954). Thus, "a trial judge maintains considerable latitude in controlling the conduct of a trial subject only to an abuse of discretion standard." *Johns Hopkins Hosp. v. Pepper,* 346 Md. 679, 700, 697 A.2d 1358, 1368 (1997). Of course, the trial judge is expected to be an impartial arbitrator, a role that is best discharged when the

judge does not dominate the trial, but rather interjects himself or herself as little as possible into the trial because of the inordinate influence that may emanate from his or her position, especially in a jury case, if jurors interpret the judge's dominance or questions as indicative of his or her opinion about the case. *United States v. Green,* 429 F.2d 754, 760 (D.C.Cir.1970).

Consequently, the trial judge is due, and, in fact, has been given, at least until now, considerable deference with respect to determinations and rulings made during the trial. In *State v. Hawkins,* 326 Md. 270, 278, 604 A.2d 489, 493 (1992), for example, we explained, as to the prejudice determination:

"The fundamental rationale in leaving the matter of prejudice *vel non* to the sound discretion of the trial court is that the judge is in the best position to evaluate it. The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his [or her] finger on the pulse of the trial."

*See Hill v. State,* 355 Md. 206, 221, 734 A.2d 199, 207 (1999). Similarly, with respect to the decision to grant or deny a new trial:

"Accordingly, it may be said that the breadth of a trial judge's discretion to grant or deny a new trial is not fixed and immutable; rather, it will expand or contract depending upon the nature of the factors being considered, and the extent to which the exercise of that discretion depends upon the opportunity the trial judge had to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and justice."

*Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 59, 612 A.2d 1294, 1298 (1992). It should also be observed, with respect to the exercise of discretion:

"In that regard, and clearly relevant to whether there has been an abuse of discretion, judges are presumed to be 'men

[and women] of discernment, learned and experienced in the law and capable of evaluating the materiality of evidence,' a proposition that is of some considerable significance in our jurisprudence. *State v. Babb,* 258 Md. 547, 550, 267 A.2d 190, 192 (1970). They are also presumed to know the law and lawfully and correctly to apply it. *Smith v. State,* 306 Md. 1, 8, 506 A.2d 1165, 1168 (1986), citing *Hebb v. State,* 31 Md.App. 493, 499, 356 A.2d 583, 587 (1976). Additionally, a judge's presence at the trial, conducting it, with his or her 'finger on the pulse' of the situation, *Brooks [v. Daley],* 242 Md. [185,] 197, 218 A.2d [184,] 191, renders him or her the logical and, indeed, the best person to evaluate the existence of prejudice. *Hawkins,* 326 Md. at 278, 604 A.2d at 493. Having lived with the case, the trial judge views the situation in three dimension, up close and personal, not from a cold record; thus, having closely observed the entire trial, he or she is able to appreciate 'nuances, inflections and impressions never to be gained from a cold record,' *Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 59, 612 A.2d 1294, 1298 (1992), not to mention being able to assess, firsthand, the demeanor of the witnesses as well as the reaction of the jurors and counsel to those witnesses and to the evidence as it is adduced."

*Medical Mut. Liability Ins. Soc. of Maryland v. Evans,* 330 Md. 1, 34–35, 622 A.2d 103, 119 (1993) (Bell, J. dissenting).

That applies as well to the granting or refusal to grant a remittitur. *Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969, 976 (1988); *Conklin v. Schillinger,* 255 Md. 50, 68, 257 A.2d 187, 196 (1969); *State, Use of Shipley v. Walker,* 230 Md. 133, 137, 186 A.2d 472, 474 (1962).

We have also recognized that the decision to order, or not, a mistrial is one that requires the assessment of prejudice, *ACandS, Inc. v. Godwin,* 340 Md. 334, 407, 667 A.2d 116, 151 (1995); *Evans,* 330 Md. at 19, 622 A.2d at 112 (1993), a determination which lies in the sound discretion of the trial judge, and appellate review of the denial of the motion is limited to determining whether there has been an abuse of discretion. *Evans,* 330 Md. at 19, 622 A.2d at 112; *State v.*

*Hawkins,* 326 Md. 270, 277, 604 A.2d 489, 493 (1992); *DeMay v. Carper,* 247 Md. 535, 540, 233 A.2d 765, 768 (1967); *Jacobson v. Julian,* 246 Md. 549, 561, 229 A.2d 108, 116 (1967); *Brooks v. Daley,* 242 Md. 185, 197, 218 A.2d 184, 191 (1966). An "abuse of discretion [will] be found only in the extraordinary, exceptional, or most egregious case." *Evans,* 330 Md. at 34, 622 A.2d at 119.

Under the test for appellate review of a trial judge's exercise of discretionary power:

> "Discretion . . . is abused when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion."

*Canakaris v. Canakaris,* 382 So.2d 1197, 1203 (Fla.1980) (quoting *Delno v. Market Street Railway Company,* 124 F.2d 965, 967 (9th Cir.1942)).

The majority professes to recognize the central and critical role of the trial judge in the conduct of the trial and, therefore, that his or her rulings, in particular with respect to new trials and mistrials, are entitled to deference, and that a "high standard" of abuse of discretion must be employed in assessing their propriety. 371 Md. 378, 412, 849 A.2d 504, 525 (2004). It also acknowledges that a timely objection to the challenged argument or evidence ordinarily is a prerequisite to appellate review. *Id.* at 415–16, 849 A.2d at 526–27, citing *Buck,* 328 Md. at 61, 612 A.2d at 1299, for the proposition that "ordinarily a party will not be permitted to raise on appeal an error to which he has not interposed a seasonable objection at trial." Nevertheless, conceding that the petitioner did not object to the respondents' "race-based arguments and 'evidence' during trial," [3] and notwithstanding the trial judge's having denied the petitioner a new trial, after having considered and rejected

---

3. There is no issue, from my perspective, as to the propriety of appeals to race; it simply is not permitted, and should not be. My concern is

the exact same arguments made by the petitioner in its post trial motions, the majority grants the petitioner a new trial. *Id.* at 415–16, 849 A.2d at 526–27. The trial judge abused her discretion in refusing to order a new trial, it concludes,

> "[i]n light of the number of references to race in the record of this trial,[4] the trial judge's observations of the very strong reactions of the jury to racially-tinged testimony, and the potential harm to the Maryland judicial system if this type of overt tactic were to be permitted to prevail."

*Id.* at 414, 849 A.2d at 526.[5] Acting in the absence of an objection is necessary,[6] the majority says, to prevent the use

---

whether the approach the majority takes in this case, which will be precedent for subsequent cases, is necessary or the most effective way of achieving the result that the Court believes to be the proper one when race-based issues are presented. My approach is to utilize the trial judges in insuring the fairness of the trial from the beginning, rather than relying on the after-the-fact determinations of the appellate court, necessarily made on a cold record.

4. The majority states that there were sixty-three references in the record to race, in particular or discrimination. As the majority itself admits, its survey of the record, which it characterizes as "careful," was unscientific.

5. Curiously missing from the majority's listing is any indication or allegation that the trial court acted improperly in the conduct of the trial. There is no indication that the trial judge would not have entertained or ruled appropriately on any motion or objection that the petitioner might have made, premised on the conduct that it alleges, after the fact, was improper.

6. It is of interest that even the majority recognizes that the petitioner bears some fault for the "deterioration" of the trial and its deviation from the issues. The majority, in that regard, observes:

> "The picture that emerges is that Respondents, Respondents' counsel, and many of Respondents' non-party witnesses apparently intended to convey to the jury an explicit racial animus element attributed to ... Petitioner's alleged employees. Petitioner, apparently unwilling to object or to ignore the specter of race introduced into the trial, attempted to defend against such assertions. Thus, as presented to the jury, the case was as much about alleged race discrimination as it

of "improper and irrelevant race-based...arguments...to inflame a jury." *Id.* at 416–17, 849 A.2d at 527–28.

These rulings are premised on appellate fact-finding. On a cold record, without the benefit of seeing or hearing first hand either the witnesses or their counsel, observing the jurors, or experiencing the unfolding of the trial and its shifting and changing atmosphere, the majority finds:

> "While some reference to race was necessary to explain to the jury why Respondents refused to leave the Typhoon Sea Coaster boat and thereby set the scene for testimony regarding the alleged physical over-reaction of the Six Flags employees, Respondents employed race overtly to overwhelm the material issues of provocation and of the reasonableness vel non of the actions of the Six Flags employees. It is apparent to us from our review of the record that the focus of the trial shifted to the propriety of the decision not to let Shaniqua enjoy the ride."

*Id.* at 411, 849 A.2d at 524. The majority also drew conclusions with respect to the size of the jury's monetary verdicts:

> "The resulting verdicts, a combined $1,000,000 in compensatory damages and $1,500,000 in punitive damages, seem out of proportion (excessive) in a case where the Respondents/Plaintiffs offered no evidence of major or permanent physical or mental injuries and where their confinement, if wrongful, was for about an hour. Respondents, with the exception of Shaniqua, were each handcuffed for about an hour and were forced to walk through the park in plain view of other patrons. They each complained of immediate, but short-term, emotional distress caused by their treatment.

> \* \* \* \*

> "We conclude that there exists a significant probability that the jury's verdicts in the present case were influenced by

---

was about false imprisonment, assault, battery, or negligent supervision."
381 Md. 378, 406–07, 849 A.2d 504, 521 (2004).

Respondents' irrelevant and improper injection of racial considerations into the trial."

*Id.* at 407–10, 849 A.2d at 522–23.

The trial judge presided over the trial from its beginning, having the advantage of seeing the witnesses as they testified, and the lawyers as they argued and conducted the case for their respective clients. She was in a uniquely advantageous position, much better than that afforded by a cold record, and, therefore, afforded to the majority, to gauge the atmosphere of the trial, to feel the pulse, if you will, and to assess the conduct of the parties. As indicated, the petitioner did not object to any of the arguments and evidence it labeled as race-based in its post trial motions and that the majority accepts on appeal. There is no suggestion that the trial judge conducted herself in any way that was improper or that she was biased or would not have ruled on the objections made objectively and fairly and seriously. She had the benefit of this first-hand experience on which to call when reviewing the post trial motions. Obviously, having called on that experience, she did not find any merit in the argument that extraneous racial issues overwhelmed or predominated the case or that the trial was conducted unfairly to the petitioner. Indeed, having been present throughout the trial "in the best seat in the house," she determined that the verdict returned by the jury did not shock her conscience and, therefore, was not excessive.

It is the discretion of the trial bench, exercised in the interest and pursuit of justice and characterized by a sense of fair play, that exemplifies the Judiciary and is most responsible for whatever trust and confidence this branch of government enjoys. It is for that reason, and as we have seen the superior vantage point from which the trial judge views and oversees the proceedings, that trial judges are entitled to, and receive, considerable deference. It is, as, indeed it should be, rare that the judgment of the trial judge on a discretionary matter should be disregarded and replaced with that of the appellate court. It usurps the role of the trial judge and such usurpation of the trial judge's role undermines his or her discretion and effectiveness. That is particularly the case

when the trial judge is not given the opportunity, in the first instance to determine whether there is error and, if so, to address or cure it.

While perhaps well intended, the new rule announced in this case, usurps the trial court's role and effectiveness, effects significant changes in trial procedure and is unworkable. The trial judge occupies a central and critical role in the judicial system. He or she is charged with conducting the proceedings and is given considerable control and discretion to do so. Included in that control and discretion are a range of options to address prejudicial statements, arguments or situations. Thus, as even the majority acknowledges:

> " '[I]mproper or prejudicial statements, remarks or arguments of counsel generally are cured by reproof by the trial judge; to [the trial judge's] discretion customarily is left the choice of methods to protect the fair and unprejudiced workings of the judicial proceedings and [his or her] decision as to the effect of that choice upon the jury and only in the exceptional case, the blatant case, will [his or her] choice of cure and his [or her] decision as to its effect be reversed on appeal.' "

*Id.* at 413, 849 A.2d at 525 (quoting *DeMay*, 247 Md. at 540, 233 A.2d at 768). In addition, there are now procedural rules, designed to promote efficiency in administration and fairness. Thus, objections are required to be made to evidence in a timely manner as are motions seeking a judicial response.

Under the rule announced today, it is the appellate court that decides whether, in a particular case, the allegations that a party "employed race overtly to overwhelm the material issues" are true and whether the prejudice to the complaining party was so great as to deny that party a fair trial. Not only are these decisions, which usually are reserved to the trial judge in the first instance, no longer so reserved, but the trial judge's decision with respect to them, once greatly respected, if not ordinarily dispositive, is entitled it appears, effectively, to little or no weight.[7] There being now no requirement that

---

7. It must be seen as ironic, at the least, that the trial court determined that the proceedings were not so racially-charged and overwhelming as

the complaining party comply with the usual rule that makes objection ordinarily a prerequisite to appellate review of an issue, the trial judge can be, and it should be expected, will be, sand-bagged; there is no incentive to bring to the attention of the trial judge a situation that one party views as an evolving racially-overwhelming one and allow him or her to assess it and, if necessary, correct it.[8] This is true despite the judge's vantage point and that he or she did not notice anything about the trial or the parties out of the ordinary and does not believe the allegations were borne out.

Presumably, despite this rather significant change in the manner in which an appellate court will review cases in which there are references to race or ethnicity, the trial judges will retain their long-standing responsibility to conduct and control or police trial proceedings. The majority provides precious little guidance as to how trial judges are to discharge that responsibility. Other than facilitating the raising of the issue on appeal—remember that a timely objection is no longer required and the issue, therefore, need not have been decided by the trial court—and indicating that the case must involve references to race and that there must be "potential danger to the Maryland Judicial system," the trial judges have not been given a bright line rule. The question is presented, therefore, how do they discharge their responsibility under this new formulation? Do they interject themselves into any case in

---

to be so prejudicial that the grant of a new trial was required, but that the majority found, nonetheless, that the trial judge abused her discretion. Presumably, the majority has weighed the evidence and sees the proceedings differently than the trial judge and has chosen to accept only a small part of her observations, those related to juror reaction to only a small bit of testimony. It disregards, seemingly entirely, the rest of the trial court's analysis, in favor of its own.

8. A party really does not have anything to lose by not objecting to the use of what that party believes is inappropriate race-based evidence, the issue is reviewable in any event, so long as the appellate court can be convinced of its seriousness and impact on the verdict. The latter apparently requires only a determination that the amount of the monetary verdict is somewhat out of line with what the appellate court thinks sufficient. It may well be that this rule provides some incentive for the party to encourage the use of the evidence so as to have a fail safe.

which there is any mention of race, giving admonitions to counsel and cautionary instructions to the jury, at the first occurrence, thus disrupting and interfering with the trial strategy of counsel? Or do they do nothing and allow the appellate court to sort it out?

In my view, it is a colossal waste of time and resources to, in effect, marginalize the role of the trial judge in this kind of case. I have no doubt that they are sensitive to the need to ensure that both parties receive a fair trial and they know how to police the proceedings so as to limit the admission of extraneous or irrelevant evidence or conduct. Their ability to do so is enhanced, not hampered, by the procedural rules requiring the parties to bring evidentiary matters and objections to their attention for decision. The Supreme Court of Texas, one of the jurisdictions on whose cases the majority relies, recognizes that limited judicial resources should be deployed for retrials because of incurable jury arguments only rarely, because "[e]ven strong appeals to prejudice become harmless when a jury is instructed to disregard them, 'for which reason it is logical to require an objection and instruction.'" *Texas Employers' Ins. Ass'n v. Guerrero,* 800 S.W.2d 859, 869 (Tex.App.1990) (Biery, J. dissenting), quoting *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 840 (Tex.1979), in turn, quoting *Wade v. Texas Employers' Ins. Ass'n,* 150 Tex. 557, 244 S.W.2d 197, 199 (1951).

I dissent.